David LEE, Appellant/Cross–Appellee,

v.

UNITED STATES, Appellee/Cross–Appellant.

UNITED STATES, Appellant/Cross–Appellee,

v.

Reginald C. SPEARS, Appellee/Cross–Appellant.

Nos. 93–CO–714, 93–CF–730, 93–CO–761, 93–CO–769, 93–CF–770, and 93–CO–855.

District of Columbia Court of Appeals.

Argued Sept. 7, 1995.
Decided Dec. 14, 1995.

Jonathan Zucker, with whom Patricia Daus, Washington, DC, was on brief for appellant/cross-appellee David Lee.

Richard S. Stolker, Rockville, MD, for appellee/cross-appellant Reginald C. Spears.

Roy W. McLeese, III, Assistant U.S. Attorney, with whom Eric H. Holder, Jr., U.S. Attorney, and Laura Leedy Gansler, Special Assistant U.S. Attorney, and John R. Fisher, Barbara A. Grewe, Margaret M. Lawton, and S. Hollis Fleischer, Assistant U.S. Attorneys, were on brief, for appellant/cross-appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

SCHWELB, Associate Judge:

A jury acquitted appellants David Lee and Reginald C. Spears, defendants below, of second degree murder while armed (SDMWA),[1] but convicted each man of voluntary manslaughter while armed (VMWA) and of several associated offenses.[2] In a post-trial order, the trial judge set aside appellants' convictions of VMWA and substituted therefor convictions of unarmed manslaughter. He held that VMWA was not a lesser included offense (LIO) of SDMWA and that the jury therefore should not have been permitted to consider VMWA.

In a separate post-trial order, the judge denied a motion by Lee for a new trial on the basis of newly discovered evidence. Lee's motion was based on the alleged recantation by a prosecution witness of certain testimony incriminating Lee.

The government has appealed from the judge's order vacating appellants' VMWA convictions. It contends that VMWA is a lesser included offense of SDMWA, and that the jury was properly permitted to consider VMWA. We agree with the government and direct that appellants' VMWA convictions be reinstated.

Each defendant has appealed, on various grounds,[3] from all of his convictions. Lee has filed a separate appeal from the order denying his motion for a new trial. We affirm all of the defendants' convictions and conclude that the judge did not abuse his discretion in denying Lee a new trial.

## I.

### THE EVIDENCE

This case had its genesis in a disagreement over the quality of a batch of cocaine. On March 2, 1990, John Bivens, who was originally appellants' codefendant, purchased this cocaine from the decedent, Kenneth Adams, for the purpose of resale to Bivens' customers. When Bivens began to sell small bags of the cocaine in his own neighborhood, several purchasers complained that the merchandise was defective. Bivens returned these customers' purchase money, and decided to seek a refund from Adams.

Three of Bivens' associates—appellants Lee and Spears and a man named Marvin

---

1. D.C.Code § 22–2403, –3202 (1989). Unless otherwise specified, all references in this opinion to the District of Columbia Code are to the 1989 Replacement Edition.

2. Each man was found guilty of possession of a firearm during a crime of violence (PFCV) in violation of D.C.Code § 22–3204(b), and of carrying a pistol without a license (CPWOL), in violation of § 22–3204(a). Lee was also convicted of obstruction of justice, in violation of D.C.Code § 22–722, and of felony threats, in violation of § 22–2307.

3. Both appellants contend that the trial judge abused his discretion by admitting into evidence a photograph of the decedent's head. Lee also claims that the trial court committed prejudicial error by overruling his objection to improper prosecutorial argument by admitting hearsay evidence, by declining to find and failing to sanction a "Jencks Act" violation, and by denying his motion for judgment of acquittal on one obstruction of justice count. Spears contends that the trial judge abused his discretion by denying Spears' motion for a severance of defendants. See Part III of this opinion and notes 25 and 26, *infra*.

Jennings—had been with Bivens when he bought the cocaine from Adams. After Bivens' customers complained, all four men returned to Adams' neighborhood. When they made contact with Adams, the latter insisted that the cocaine which he had sold to Bivens was of good quality, and he refused to return Bivens' money. Adams and Bivens eventually agreed to have the quality of the drugs "tested" by Kathleen Washington, a "pipehead" who was apparently able to assess the quality of the cocaine. Ms. Washington went downstairs in order to determine whether the drugs were defective.

Although different witnesses provided sharply conflicting accounts of the events that followed and of the roles of the various participants,[4] it appears that Spears and Lee became embroiled in a dispute with Adams. The quarrel escalated, and Adams was ultimately shot at close range, once in the head and once in the groin area. Adams died immediately.

According to two of the witnesses, at least one of these shots[5] was fired by Spears. Bivens, who had entered an *Alford*[6] plea to manslaughter, and who was subsequently called as a witness for the prosecution, testified that Lee had passed a pistol to him, and that he (Bivens) then passed the weapon on to Spears. Bivens also stated that Lee had another handgun in his possession. Although there was no direct testimony that Lee shot Adams, the prosecution's theory of the case, based on the circumstantial evidence, was that Lee was the second shooter.

Appellants were ultimately acquitted of SDMWA, but convicted of VMWA and of other offenses as described above. These appeals and cross-appeals followed.

## II.

### THE GOVERNMENT'S APPEALS

■ At the time Adams was shot to death, the maximum penalty for SDMWA was im-

prisonment for from fifteen years to life. D.C.Code §§ 22–2404, –3202. The maximum penalty for VMWA was imprisonment for from fifteen years to life and a $1,000 fine. D.C.Code §§ 22–2405, –3202.[7] Both appellants contend, and the trial judge held, that by virtue of the authorized $1,000 fine, the maximum penalty for VMWA is greater than the maximum penalty for SDMWA, and that the former offense therefore cannot be a lesser included offense of the latter. Appellants' argument, which both the trial judge and counsel for Lee candidly described as "counter-intuitive," has a measure of surface plausibility in light of some of this court's precedents. We conclude, however, that Lee and Spears were properly convicted of VMWA, and that their convictions of that offense must therefore be reinstated.

The Supreme Court and this court have traditionally employed an "elements" test to determine whether one offense is a lesser included offense of another, without any discussion of the provisions in the respective statues relating punishment. *See, e.g., Schmuck v. United States*, 489 U.S. 705, 716, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989); *Price v. United States*, 602 A.2d 641, 644 (D.C.1992); *Pendergrast v. United States*, 332 A.2d 919, 924 (D.C.1975). It is undisputed that under an "elements" analysis, VMWA is an LIO of SDMWA. *Comber v. United States*, 584 A.2d 26, 42–43 (D.C.1990) (en banc); *Price, supra,* 602 A.2d at 644–45; *Coreas v. United States*, 585 A.2d 1376, 1380 (D.C.) (*Coreas II* ), cert. denied, 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 130 (1991); *Branch v. United States*, 382 A.2d 1033, 1035 n. 1 (D.C.1978). The two offenses have identical elements, except that SDMWA requires proof that the defendant acted with malice, but VMWA does not. *Comber, supra,* 584 A.2d at 36. Indeed, the doctrine that voluntary manslaughter is a lesser included of-

---

4. Most of these conflicts are essentially irrelevant to the issues on appeal. We confine our factual recitation to matters germane to those issues.

5. The prosecution's ballistic evidence showed that several shots had been fired from two different .45 caliber weapons.

6. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

7. The statute fixing the penalty for manslaughter has since been amended, and no longer provides for a fine. *See* D.C.Code § 22–2405 (Supp.1995).

fense of second degree murder is of ancient vintage. *See, e.g., Stevenson v. United States,* 162 U.S. 313, 314–15, 16 S.Ct. 839, 840, 40 L.Ed. 980 (1896).

We recognize, and the government concedes, that the precise question raised by appellants in this case was not addressed in *Comber* or in any of the other VMWA decisions cited above. Because "the judicial mind has [not] been applied to and passed upon [that] question," *see, e.g. Murphy v. McCloud,* 650 A.2d 202, 205 (D.C.1994), those decisions are not controlling. Nevertheless, a holding today that voluntary manslaughter while armed is not a lesser included offense of second degree murder while armed would shatter expectations grounded in many years of history.

*A. Rule 31(c).*

■■■ Rule 31(c) of the Superior Court's Rules of Criminal Procedure, entitled "*Conviction of a lesser included offense,*" provides in pertinent part that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged. . . ." The comment to the Rule discloses that, with exceptions not affecting sub-section (c), local rule 31 is "identical to Federal Rule of Criminal Procedure 31." [8] Accordingly, absent some compelling reason to the contrary, we should construe the local rule in a manner consistent with the federal rule. *Montgomery v. Jimmy's Tire & Auto Ctr.,* 566 A.2d 1025, 1027 (D.C.1989).

■■■ The "lesser included offense" doctrine "originally developed as an aid to the prosecution in cases in which the proof failed to establish some element of the crime charged." *Beck v. Alabama,* 447 U.S. 625, 633, 100 S.Ct. 2382, 2387, 65 L.Ed.2d 392 (1980); *see also Kelly v. United States,* 125 U.S.App.D.C. 205, 207, 370 F.2d 227, 229 (1966), *cert. denied,* 388 U.S. 913, 87 S.Ct.

2127, 18 L.Ed.2d 1355 (1967). In conformity with this history and with the language of federal Rule 31(c), which permits conviction of any offense "necessarily included" in the offense charged (without any reference to punishment), the Supreme Court of the United States has explicitly applied an "elements" analysis in construing the Rule. *Schmuck, supra,* 489 U.S. at 716, 109 S.Ct. at 1450. Specifically, the Court has held that the determination whether an offense is a "lesser included" offense of an allegedly "greater" offense is made by comparing the statutory elements of the two offenses. *Id.* A lesser included offense charge is proper when "the elements of the lesser offense are a subset of the elements of the charged offense." *Id.* Accordingly, in the words of the United States Court of Appeals for this Circuit, "[w]e see no reason to create the additional and novel requirement that the penalty for the lesser offense be lower than that for the greater." *United States v. Harley,* 301 U.S.App.D.C. 70, 74, 990 F.2d 1340, 1344, *cert. denied,* —— U.S. ——, 114 S.Ct. 236, 126 L.Ed.2d 190 (1993).

■■■ "[T]he adjective 'lesser' in Criminal Rule 31(c) refers to the relation between the elements of an offense [and] not [to] the relation between their penalties." *Nicholson v. State,* 656 P.2d 1209, 1212 (Alaska App. 1982); *see also Schmuck, supra,* 489 U.S. at 716, 109 S.Ct. at 1451 (the language of the rule "suggests that the comparison to be drawn is between offenses"). "The terms 'lesser' and 'greater' actually refer to the number of elements in the respective crimes, because the offense charged must contain all the elements of the included offense plus at least one additional element." *State v. Caudillo,* 124 Ariz. 410, 604 P.2d 1121, 1123 (1979) (en banc) (citing *Sansone v. United States,* 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965)).[9]

---

8. "Like the federal rules, the Superior Court rules (at least where substantially identical to the federal rules) have the force of law." *See, e.g., Cooper v. United States,* 353 A.2d 696, 701 n. 11 (D.C.1975).

9. *See also State v. Gilman,* 105 Idaho 891, 895, 673 P.2d 1085, 1089 (App.1983) ("the doctrine of the lesser included offense is not limited to an

offense less serious than the crime charged"); *State v. Gallup,* 500 N.W.2d 437, 442–442 (Iowa 1993) (under elements test, "it makes no difference that the lesser included offense here carries a higher penalty than the greater"); *State v. Young,* 305 N.C. 391, 289 S.E.2d 374, 376 (1982) (applying "elements test" to statute authorizing conviction of "the crime charged [in the indictment] or of a lesser degree of the same crime");

Authorities in this jurisdiction which predate *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971), are to the same general effect. In *Crosby v. United States*, 119 U.S.App.D.C. 244, 339 F.2d 743 (1964) (Burger, J.), the court construed Rule 31(c) "to mean that a chargeable lesser offense must be such that the greater offense cannot be committed without also committing the lesser." *Id.* at 245, 339 F.2d at 744 (citations omitted). Three years later, the court, quoting *Crosby*, reiterated the same conclusion. *Kelly*, 125 U.S.App.D.C. at 206, 370 F.2d at 228.[10]

Although the question whether the LIO must have a lesser penalty than the greater offense was not raised in *Schmuck, Crosby*, and *Kelly*, the court's analysis in each of those cases precludes an affirmative answer to that question. Indeed, the United States Court of Appeals for the District of Columbia Circuit recently relied on *Schmuck, Crosby*, and *Kelly* in declining to impose a requirement that the penalty for the LIO be less than the penalty for the greater offense. *Harley, supra*, 301 U.S.App.D.C. at 74, 990 F.2d at 1344. Accordingly, absent binding precedent to the contrary, affirmance of appellants' VMWA convictions is required both by Rule 31(c) and by the traditional approach to the lesser included offense doctrine.

### B. The Case Law.

In his post-trial order vacating those convictions, the trial judge relied primarily on *Ball v. United States*, 429 A.2d 1353 (D.C. 1981) and *Craig v. United States*, 523 A.2d 567 (D.C.1987). We stated in *Ball* that the legislature could not have intended one offense to be a lesser included offense of a second where "the offense with the seemingly fewer constituent elements ... carries a much more severe penalty than an alleged

greater offense." 429 A.2d at 1360. We subsequently held in *Craig* that defacing of property was not a lesser included offense of malicious destruction of property (MDP) because, although both offenses were punishable by imprisonment for one year, the maximum fine for defacing was $5,000, while the maximum fine for MDP was only $1,000.

The opinion in *Ball* appears on its face to lend some support to appellants' position, but that support evaporates on closer analysis. *Ball* was a "multiple punishment" or "merger" case, and neither Rule 31(c) nor the lesser included offense doctrine was directly implicated.[11] The question in *Ball* was whether the defendant, who was convicted both of threats and of obstruction of justice as a result of the same unlawful acts, was being punished twice for the same offense, in violation of the Double Jeopardy Clause. Ball contended that what he characterized as the "lesser" offense of threats, which carried a maximum penalty of imprisonment for twenty years and a fine of $5,000, merged into what he claimed was the "greater" offense of obstruction of justice, which was punishable by imprisonment for three years and a fine of $1,000.

Rejecting Ball's position, this court concluded that each of the two offenses required proof of a fact which the other did not, *id.* at 1358–59 (citing *inter alia, Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)), and that there was therefore no merger. The court stated that this conclusion was strengthened by the disparity in punishment for the two offenses. *Ball*, 429 A.2d at 1360. The court's subsequent articulation of a purported requirement that the punishment for the LIO must also be less than the penalty for the "greater" offense [12]

("[t]here is no requirement in our law that an included offense must also be one which is subject to less punishment than the 'greater offense' charged in the indictment"); *Johnson v. State*, 828 S.W.2d 511, 515–16 (Tex.App.1992) ("The determination of whether an offense is a lesser-included offense of the offense charged is made without regard to punishment.... The word 'lesser' does not refer to the punishment range but to the factor that distinguishes the included offense from the offense charged.")

10. Although the courts in these cases were construing the *federal* rule and not the local one,

they were interpreting the very language from which the local rule was taken.

11. The court briefly discussed the LIO doctrine, *Ball*, 429 A.2d at 1360 n. 13, but did not mention Rule 31(c).

12. In *Ball*, we quoted from *United States v. Cady*, 495 F.2d 742, 747 (8th Cir.1974):

A lesser included offense must be both lesser and included. These requirements can only be

was not necessary for the disposition of the case, and thus constituted "dictum" not binding on us under the doctrine of *M.A.P. v. Ryan. See, e.g. Punch v. United States*, 377 A.2d 1353, 1360 (D.C.1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978). Moreover, the striking difference in *Ball* between the penalties for threats and for obstruction of justice—twenty years and $5,000 for the "lesser offense," three years and $1,000 for the "greater"—provides a compelling distinction from the present case, in which both offenses were punishable by life imprisonment and the only difference between their maximum penalties was the $1,000 fine for VMWA.[13]

*Craig* presents a more difficult problem. In *Craig*, as in this case, the supposedly greater and lesser offenses were subject to identical maximum prison terms. In that case, as in this one, a person convicted of the "lesser" offense was subject to a fine larger than that which could be imposed for the greater offense.[14] The court held that

> [b]ecause the maximum fine for defacing property is greater than the maximum fine for malicious destruction of property, *Ball* compels us to rule that the former is not a "lesser" offense than the latter.

*Craig, supra*, 523 A.2d at 569. This was the sole ground upon which the court decided the case, and it thus represented the court's square holding.[15]

*Craig*, however, has been superseded by events.[16] In *Schmuck*, decided two years after *Craig*, the Supreme Court explicitly adopted an "elements" approach to LIO analysis. Such an analysis has nothing to do with punishment. Still more recently, in *Byrd v. United States*, 598 A.2d 386 (D.C. 1991) (en banc), this court likewise adopted an "elements" test as appropriate for determining issues of Double Jeopardy, and we specifically noted the Supreme Court's decision in *Schmuck* "resolving a split among the circuits and applying an 'elements' test to the determination whether a lesser-included offense instruction should be given under FED. R.CRIM.P. 31(c)." *Id.* at 389 n. 5. Notwithstanding the fact that the "lesser punishment" requirement was not at issue in *Schmuck* or *Byrd*, we do not believe that *Craig* can be reconciled with these decisions.[17]

■ This court will not lightly deem one of its decisions to have been implicitly overruled and thus stripped of its precedential authority. "We do not believe, however, that *M.A.P. v. Ryan, supra*, obliges us to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions," *Frendak, supra*, 408 A.2d at 379 n. 27; *see also Abney v. United States*, 616 A.2d 856, 861 (D.C. 1992), or by our own supervening rulings en banc. The legal basis for *Craig* has, in our view, been "substantially undermined" by *Schmuck* and *Byrd*.

Our disposition of this case is also supported by *United States v. Pearson*, 202 A.2d

---

met where the included offense involves fewer of the same constituent elements as the charged greater offense *and where the claimed lesser offense has a* lighter penalty attached to it than does the charged offense.

429 A.2d at 1360 (emphasis added). Lee relies heavily on the emphasized language.

**13.** The court in *Ball* also reasoned that "the offenses of threats and obstruction of justice lack the 'inherent relationship' required to apply the doctrines of merger and lesser included offenses." 429 A.2d at 1360 (citing *inter alia, United States v. Whitaker*, 144 U.S.App.D.C. 344, 349, 447 F.2d 314, 319 (1971). Since *Ball* was decided, the Supreme Court, after quoting from *Whitaker*, explicitly rejected that decision's "inherent relationship" test, and adopted the "elements" test instead. *Schmuck, supra*, 489 U.S. at 715–16, 109 S.Ct. at 1450.

**14.** In the present case, no fine could be imposed for SDMWA.

**15.** The court found it unnecessary to decide "the separate issue of whether defacing property is 'included' within malicious destruction of property." *Id.* at 569 n. 6 (citations omitted).

**16.** We note that in *Craig*, the court, viewing itself as bound by *Ball*, did not address Rule 31(c) at all. *Cf. Frendak v. United States*, 408 A.2d 364, 379 n. 27 (D.C.1979); *Murphy, supra*, 650 A.2d at 205.

**17.** Recently, in *Hicks v. United States*, 658 A.2d 200 (D.C.1995), we raised the question whether the authority of the cases on which *Craig* relied had survived *Byrd*, but we found it unnecessary to resolve that issue. *Id.* at 204 n. 9.

392 (D.C.1964). In *Pearson*, the defendant was charged with attempted petit larceny. The "attempt" statute, D.C.Code § 22–103 (1961), provided for a maximum penalty of imprisonment for one year and a $1,000 fine. The petit larceny statute, D.C.Code § 22–2202 (1961), provided that a completed petit larceny was punishable by imprisonment for one year and a fine of no more than $200. The trial judge dismissed the information, apparently holding that attempted petit larceny was not a prosecutable offense because an attempt to commit an offense could not carry a heavier penalty than the offense itself. *Pearson, supra,* 202 A.2d at 392.

■ This court reversed. The court recognized that "[i]t never could be the intention of the legislature to punish with greater severity an abortive attempt than a successful issue or leave it in the power of the court to do so." *Id.* at 393 (quoting *Rogers v. Commonwealth,* 5 Serg. and R. 463 (Pa.1819)). The court invited Congress to take corrective legislative action. *Id.* at 394. The incongruity in the maximum penalties, however, did not warrant dismissal of the information, because

> there is no invalidity in the law as it now stands. As a practical matter this problem, if problem there be, can easily be handled in each case when the time for sentence arrives. This, like many other situations, may safely be entrusted to the reasonableness, understanding and common sense of the trial judges. Until a defendant is subjected to a sentence for an attempted crime that is greater than the maximum penalty for the completed crime, it cannot be said that the statutes have been misapplied. We are satisfied that

there is no reason for holding that the attempt statute is invalid or inoperative. *Id.*

Although *Pearson* was not technically a "lesser included offense" case, *id.* at 392, the quoted reasoning applies with equal force to the present case. Here, as in *Pearson,* any perceived problem can be avoided at the time of sentencing. If no fine is imposed, then "it cannot be said that the statutes have been misapplied." *Id.* at 394. *Pearson* is consistent with the law in other jurisdictions [18] and provides a common sense resolution of the issue before us.

— — —

Having addressed the doctrinal considerations implicated by the interplay of *Craig* with *M.A.P. v. Ryan,* we must also consider the practical consequences of the decision we make in this case.[19] Donald S. Craig was charged with malicious destruction of property for writing the words "Fool's Gold" and two dollar signs on the wall of the shelter of a Metro bus stop. Given the nature of the conduct which precipitated the prosecution, the issue in *Craig* involved the interplay between two relatively minor misdemeanors. The trial judge, on his own initiative, instructed the jury on the purported LIO of defacing public property. He relied on D.C.Code § 22–3112.2(a) (1986), which carried the heading "*Defacing or burning cross or religious symbol; display of certain emblems,*" but which also contained language prohibiting defacement of public property. This court, as we have seen, held that defacing public property was not a lesser included offense of MDP, but it did so without discuss-

---

18. *E.g.,* in *Hobbs v. State,* 253 Ind. 195, 252 N.E.2d 498 (1969), the court held that a defendant may be convicted of any LIO, regardless of the maximum penalty therefor, but that

> if, as in the case at bar, the lesser included offense carries a greater maximum sentence than the greater offense originally charged, the trial court has jurisdiction to sentence for a period not exceeding the maximum covered under the original charge.

*Id.* at 501. In *State v. Kost,* 290 N.W.2d 482 (S.D.1980), a case very similar to this one, the court sustained Kost's conviction for voluntary manslaughter as a lesser included offense of

murder. The two offenses were both punishable by life imprisonment, but manslaughter also carried a $25,000 fine, while there was no fine for murder. Kost was sentenced to life imprisonment, but no fine was imposed. The court held that Kost "has failed to show that his constitutional rights were violated either by the sentence imposed or through the alleged unconstitutionality of the statutes." *Id.* at 487.

19. "[W]e do not believe that the law is or should be so preoccupied with theory that practical consequences must be disregarded." *Helm v. United States,* 555 A.2d 465, 469 (D.C.1989).

ing either the provisions of Rule 31(c) or our prior decision in *Pearson.*

The Supreme Court recognized a century ago that voluntary manslaughter is a lesser included offense of second degree murder. *See, e.g., Stevenson, supra,* 162 U.S. at 314–15, 16 S.Ct. at 840. Under conventional analysis, it necessarily follows that VMWA is also an LIO of SDMWA. *Coreas II, supra,* 585 A.2d at 1380; *Stewart v. United States,* 383 A.2d 330, 331–33 (D.C.1978). A decision that *Craig*—a case about scrawling "Fool's Gold" on a bus stop—has changed all that would have implications which the court in that case had no occasion to consider. Application of *Craig's* reasoning here would preclude a defendant charged with armed murder who claimed that he acted in the heat of passion and without malice from obtaining consideration by the jury of the lesser included offense of armed manslaughter, notwithstanding the undisputed fact that armed murder contains all of the elements of armed manslaughter and requires proof of malice as well. The drafters of Rule 31(c) could not have intended such a result, and the court in *Craig* could not have contemplated it.

## III.

## THE PROSECUTOR'S REBUTTAL ARGUMENT

■ Both Lee and Spears have raised a number of contentions in support of their respective appeals. See notes 25 and 26, *infra.* Of these, only Lee's claim of improper prosecutorial argument requires plenary consideration.

At the commencement of his rebuttal, the prosecutor told the jurors:

You heard from Kathy Washington and Booker Rowe and Lamont Wilson and Arthur Richardson, and why did you hear from them? Because those are the people who saw David Lee and Reggie Spears shoot and kill Kenneth Adams.

Lee's attorney stated "Objection." The judge responded that "the objection is overruled. This is argument of counsel." Spears' attorney remained silent. Neither defense counsel raised the issue again in the trial court, and only Lee raises it on appeal.

The judge's charge to the jury included the customary instructions that the verdict must be based solely on the evidence and that the statements of counsel were not evidence. The judge then inquired of counsel whether they were requesting any additional instructions. Both defense attorneys responded in the negative.

■ Lee now contends, and the government acknowledges, that none of the witnesses named by the prosecutor during rebuttal testified that he or she saw Lee shoot Adams. We therefore conclude that the prosecutor argued facts not in evidence, and that the opening of his rebuttal argument was improper. *E.g., Coreas v. United States,* 565 A.2d 594, 602–03 (D.C.1989) (*Coreas I* ). Moreover, "[i]mproper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said." *Id.* at 605 (quoting *Hall v. United States,* 540 A.2d 442, 448 (D.C.1988)).

■ Because Lee's attorney objected to the prosecutor's misstatement, we will assume, without deciding, that Lee has preserved the issue notwithstanding his failure to address it further in the trial court.[20]

20. After the trial judge had overruled his objection, Lee's attorney could have moved for a mistrial—the equivalent of the relief he now seeks. Had he done so, we would have the benefit of the trial court's considered judgment as to the effect, if any, of the misstatement.

Lee's attorney may perhaps have viewed a motion for a mistrial as futile, for the judge had already overruled the objection. But even if we view that overruling, which avoided interruption of the closing argument, as vindicating counsel's failure to demand a mistrial later, when the issue could be discussed with more deliberation, coun-

sel was free to request a corrective instruction when the judge inquired as to whether further instructions were desired. Counsel did not do so.

In *Hunter v. United States,* 606 A.2d 139 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), we emphasized that

[l]itigants should not be permitted to keep some of their objections in their hip pockets and to disclose them only to the appellate tribunal; one cannot take his chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way.

Upon that assumption, the *Kotteakos*[21] test applies, and the question is

> whether we can say with fair assurance, after all that has happened, *without stripping the erroneous action from the whole,* that the judge was not substantially swayed by the error.

*Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989) (emphasis added; citations omitted). The italicized language is of critical significance, for

> [i]n reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

*United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (quoting *Johnson v. United States,* 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring)). Moreover, closing arguments, and especially rebuttal arguments, are "seldom carefully constructed *in toto* before the event; improvisation often frequently results in imperfect syntax and planning." *Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974); *Dixon, supra,* 565 A.2d at 79. Accordingly, courts should not attach the most sinister possible interpretation to the prosecutor's remarks. *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989) (citing *Donnelly, supra,* 416 U.S. at 643–44, 94 S.Ct. at 1871–72).

 With these considerations in mind, we examine the prosecutor's misstatement not in isolation, but in reference to the entire record. Specifically, we must consider, in context, "the gravity of the [improper argument], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Dixon, supra,* 565 A.2d at 75. We address each of these factors in turn.

### A. Gravity.

The prosecutor's misstatement at the outset of rebuttal could reasonably be viewed as very serious. If the most plausible reading of the entire record were that the prosecutor deliberately lied to the jury about what the witnesses in question had seen, such conduct would be altogether inexcusable. Contrary to the prosecutor's statement, none of the four witnesses named by him saw Lee shoot Adams.

Viewing the record as a whole, however, and bearing in mind the Supreme Court's caution against attaching sinister meanings to the prosecutor's statements, *see Donnelly, supra,* 416 U.S. at 647, 94 S.Ct. at 1873, we are not prepared to treat the isolated (but most unfortunate) comment by the prosecutor as a deliberate falsehood. Earlier, in his initial closing argument, the prosecutor had gone over the government's evidence, witness by witness. During that recitation, he mentioned at least briefly three of the four persons he later named during rebuttal as having seen Lee and Spears kill Adams. He stated, correctly, that Booker Rowe had identified Spears and *Bivens* (not Lee) as the gunmen. The prosecutor mentioned the testimony of Lamont Wilson and Arthur Richardson only in connection with their identification of *Spears* as the participant in the shooting who was wearing a white headband, and in connection with Lee's alleged attempts to intimidate them after the killing. The prosecutor also admitted that Marvin Jennings had "denied there were guns there," and he explained Bivens' testimony that Lee had passed him a handgun. During his entire initial argument, the prosecutor made no suggestion that any witness had seen Lee shoot anyone, or that any person other than Bivens had observed Lee with a handgun. He likewise said nothing further in his rebuttal argument along the lines of the misstatement with which he had begun it.

If the rebuttal argument is analyzed in conjunction with the prosecutor's initial presentation, we find it most unlikely, notwith-

---

*Id.* at 144 (citations and internal quotation marks omitted).

21. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

standing the prosecutor's infelicitous phrasing on rebuttal, that the jury would believe that he was claiming that the four named witnesses had seen Lee shoot Adams. Such a claim would have been irreconcilable with the prosecutor's own representations during his earlier remarks to the jury.

Moreover, both defendants were represented by able and experienced counsel who fought vigorously on behalf of their clients. If the attorneys had believed that the misstatement had been meant literally, and that it had been understood by the jury to have been meant literally, then they would surely have made vigorous efforts to redress the situation. Yet, Lee's attorney made only a single objection and asked for no corrective instruction. Spears' counsel did not object at all. The lack of any reaction from Spears' attorney, and the limited reaction from Lee's attorney, suggest that experienced counsel perceived little, if any, prejudice, a fact which itself suggests lack of prejudice. *Hunter, supra*, 606 A.2d at 145.

### B. Centrality.

The prosecutor's representation that four witnesses saw Lee shoot Adams, when they did not, undoubtedly goes to a central issue in the case. For the reasons stated in our discussion of the gravity of the improper argument, the record as a whole does not, in our view, support the conclusion that this was the meaning that the prosecutor intended to convey or that the jurors received.

### C. Corrective Action by the Trial Judge.

The judge instructed the jury on several occasions that the arguments of counsel are not evidence.[22] After he charged the jury, the judge also asked the defense attorneys if they were requesting any additional instructions. If Lee's attorney had accepted the judge's invitation and requested a corrective instruction, the prosecutor's misstatement might well have been cured by stipulation or otherwise. Counsel made no such request, however, and he never asked the trial court to rule that the prosecutor's misstatement warranted a mistrial or new trial—the very relief that he seeks in this court. The decision by Lee's attorney to let the case go to the jury, without first requesting corrective remedial action which might well have been available, significantly blunts the force of Lee's contentions on appeal.

### D. The Strength of the Government's Case.

The strength of the prosecution's case against Lee turned largely on the credibility of the witnesses, and is "difficult to assess . . . from our . . . appellate perch." *See Clark v. United States,* 593 A.2d 186, 193 (D.C.1991). Nevertheless, it is fair to say that the government's evidence was not overwhelming. The only witness who claimed to have seen a handgun in Lee's hands was Bivens.[23] Bivens had sworn to the grand jury before trial that Lee did not have a handgun.[24] Bivens was also the man to whom Adams had sold the allegedly defective drugs, and both defendants contended at trial, through their attorneys, that Bivens falsely implicated them in order to obtain a favorable plea bargain for himself.

The prosecution relied heavily on Lee's alleged efforts after trial to intimidate potential witnesses against him as evidence of consciousness of guilt. As to these offenses, too, the evidence was contested, and the results were mixed; Lee was convicted of some of these charges and acquitted of others.

### E. Result.

Whenever a prosecutor seriously misstates the evidence, whether deliberately or through negligence, a significant risk arises that the trial will go for naught and that the parties will have to begin all over again. In this case, the prosecutor misstated the evi-

---

22. The judge overruled a prosecution objection to an apparent misstatement during a defense attorney's argument on the same ground that he overruled Lee's objection to the prosecutor's rebuttal: "This is closing argument."

23. Arthur Richardson testified that he observed the "print" or "outline" of a pistol in Lee's

trousers, thus providing some corroboration for Bivens' account. Richardson, however, had failed to mention this "print" in his pretrial statements.

24. After the trial, Bivens recanted his accusation against Lee. See note 26, *infra*.

dence, and he did so during his rebuttal argument, when the potential for prejudice was especially great. *Coreas I, supra,* 565 A.2d at 605. We cannot, and do not, take such prosecutorial misstatements lightly.

In the final analysis, however, we must determine whether this single lapse on the prosecutor's part, assessed in the context of the entire trial, warrants reversal of Lee's convictions. Considering all of the circumstances, we conclude that the result of the trial should not be set aside on the basis of a serious but isolated misstatement during rebuttal argument.

## IV.

## CONCLUSION

■ For the foregoing reasons, the order setting aside each appellants' VMWA conviction is reversed, and these convictions are reinstated. Appellants' convictions are af-

---

firmed.[25] The order denying Lee's motion for a new trial is affirmed.[26]

*So ordered.*

---

25. We deal briefly with those of appellants' contentions not previously addressed in this opinion. We discern no abuse of discretion in the trial judge's admission of a photograph of the wound to Adams' head. *Cf. Womack v. United States,* 339 A.2d 37, 38 (D.C.1975); *Dixon, supra,* 565 A.2d at 76 n. 6. The judge's finding that no written statement by prosecution witness Arthur Richardson existed rested on the judge's assessment of credibility; it was not clearly erroneous, and Lee's request for sanctions under the Jencks Act, 18 U.S.C. § 3500, was properly denied. *See, e.g., Sullivan v. United States,* 404 A.2d 153, 156 (D.C.1979). Even if we assume, without deciding, that the trial judge erroneously admitted a police detective's testimony that two prosecution witnesses reported one of the incidents in which Lee allegedly obstructed justice, we are satisfied, in the light of the record as a whole, that any error was harmless. *See Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248. Viewing the record, as we must, in the light most favorable to the prosecution, *see Irick, supra,* 565 A.2d at 30, we conclude that there was sufficient evidence that Lamara Wilson was a witness within the meaning of D.C.Code § 22–722 and that Lee obstructed justice by threatening her. *See Smith v. United States,* 591 A.2d 229, 231 (D.C.1991). Finally, the trial judge did not abuse his discretion in denying Spears' motion for a severance. *Cf. Payne v. United States,* 516 A.2d 484, 490–92 (D.C.1986) (per curiam).

26. Lee contends that the trial judge erred in denying his motion for a new trial, which was

based on Bivens' post-trial recantation of his testimony incriminating Lee. According to Lee, "the record does not support the trial court's finding that the recanting witness' trial testimony was credible and the recanted testimony incredible." Lee argues that Bivens' post-trial version of Lee's role was consistent with his earlier testimony to the grand jury. Lee asserts that Bivens lied at trial to obtain a more favorable plea agreement.

There can be no gainsaying that Bivens contradicted himself under oath on several occasions. We can only speculate as to how the jury would have viewed the evidence if the recantation had come during the trial before the jury. We have held, however, that in the context of a motion for a new trial by a convicted defendant, it is the function of the judge to determine the credibility of a recantation. *Godfrey v. United States,* 454 A.2d 293, 300 & n. 24 (D.C.1982) (citations omitted).

The trial judge saw and heard Bivens testify at trial and again at the post-trial motions hearing. The judge found the witness' trial testimony credible and his motions testimony incredible. We are in no position to second-guess, on the basis of a paper record, a credibility determination by a trier of fact who was in the courtroom on both occasions and who had the opportunity to observe Bivens' demeanor. *In re S.G.,* 581 A.2d 771, 774–75 (D.C.1990). In light of the judge's credibility determination, the motion for a new trial was properly denied. *See Godfrey, supra,* 454 A.2d at 299–301.