Shahid TURNER, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–1444.

District of Columbia Court of Appeals.

Argued Feb. 17, 2011.
Decided Aug. 25, 2011.

Sloan S.J. Johnston, Public Defender Service, with whom James W. Klein and Shilpa S. Satoskar, Public Defender Service, were on the brief, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman, Benjamin L. Eisman, and Michael Hunter, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and BLACKBURNE–RIGSBY,* Associate Judges, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

Shahid Turner appeals from his convictions for assault with a deadly weapon and destruction of property. His main contention on appeal is that the trial judge erroneously permitted the prosecutor, in opening and rebuttal summation, to argue facts concerning Turner's motive to attack the complaining witness that were not supported by the evidence. Although the government contends that the difference between what it concedes were misstatements by the prosecutor and what the evidence fairly allowed the prosecutor to argue was insubstantial, we are not persuaded, and conclude that the trial court's failure to take corrective action was prejudicial error requiring reversal.

## I. Factual Background

Based on the identification of the complaining witness, Edgar Payton, Turner was charged with assault with intent to kill while armed (AWIKWA), possession of a firearm during a crime of violence (PFCV), carrying a pistol without a license

---

* Judge Blackburne–Rigsby replaced Judge Noel A. Kramer on the division following Judge Kramer's retirement on May 1, 2011.

(CPWL), unlawful possession of ammunition (UA), possession of an unregistered firearm (UF), and destroying property. The government theorized that Turner had attacked Payton because Payton was interfering in Turner's relationship with Payton's goddaughter, Erica Taylor. The prosecutor made extensive use of this motive theory at trial, asserting in his opening statement, and in his closing and rebuttal arguments, that Turner wanted to eliminate Payton as an ongoing obstacle to his relationship with Taylor.[1]

Payton testified that in the early morning of August 18, 2007, while asleep in his bedroom in the basement of his house, he awoke to hear his bedroom window being broken in. He looked through the broken window and saw a man he recognized as Turner. He demanded to know what Turner was doing there, then walked up the basement stairs so he could go outside and investigate. While Payton was ascending the stairs, multiple shots were fired into his bed. Once he was upstairs, and while he was discussing the incident with his roommate, the roommate exclaimed that he had just seen a person with a gun in his hand attempt to jump the back gate.

When Payton looked, he saw Turner again. Payton called 911, and when the police arrived, he identified Turner as the assailant.

Regarding his relationship with Turner, Payton testified that he had known him "since he been messing with my daughter .... maybe five, six years.... I know him because he was going with Erica. That's my daughter. Not my biological daughter, my goddaughter ... he was going with her.... It's an off and on relationship.... [H]e had stayed at my house when I lived up on Hudson Street with Erica for a few months until I stopped it." When asked whether Turner had ever visited his house in southeast Washington where the shooting occurred,[2] Payton replied, "As far as I know ... no."[3]

The defense presented testimony by Krystal Banks that in the weeks after the shooting she spoke with Payton, who informed her that Turner had shot into his bedroom. When asked how Payton was sure, Banks testified that he replied, "I seen his hair, who else could it be?" On cross examination by the prosecutor, Banks admitted that Payton did not say he

1. In his opening statement, for example, the prosecutor told the jury:
 [T]his case is not just about identification. This case is about motive too. You're gonna learn that Mr. Turner had a motive. He had a motive because Edgar Payton had been coming between Mr. Turner's girlfriend, Erica Taylor, who's Mr. Payton's goddaughter, and Mr. Turner for years.
 The situation had gotten so bad that Mr. Payton had told Mr. Turner he did not want him to ever come to his house, a place where Erica Taylor stayed some of the time. On this morning, when Shahid Turner went to that residence, he had a motive—to get Edgar Payton out of his way.
 ....
 This wasn't some random act. This was payback. And the defendant was the person there that morning to pay back Edgar Payton and to get him out of the way.

2. Payton testified that he had lived at his house in southeast for 14 years. Neither party explored how this answer corresponded with his later answers that he had only known Turner for five years and that he, Turner and Taylor had previously shared a home in northwest Washington.

3. The government also presented evidence suggesting that a cell phone owned by Turner had been traveling towards Payton's residence before the shooting, and moving in a northward direction minutes after the shooting. The defense countered with testimony that the cell sites that had recorded the northbound movements were too far from the shooting site to have been reached in the minutes between the shooting and the phone calls.

had only seen Turner's hair, or that he had not seen his face.

After the close of the evidence, the defense argued that "there was no evidence" supporting the motive theory advanced by the prosecutor in his opening, and requested that the trial court specifically instruct the jury that, regarding motive, the jury should not consider the opening statement as evidence. The trial court declined, but told defense counsel he was free to make the no-motive argument in his closing. The defense also requested an instruction that the jury could consider the lack of motive evidence as supporting innocence. The prosecutor intervened and argued that Payton's testimony indeed supported the motive theory, because "he said that he did not approve of the defendant and also the defendant's lifestyle and the way he treated his daughter and that he had prohibited the defendant from coming and seeing the daughter at the house." Defense counsel said he did not recall that testimony, but the trial judge stated that he did, "and I was paying attention because I wanted to make sure he did not go beyond the *in limine* ruling." [4]

During initial closing argument, the prosecutor highlighted his motive theory:

[M]aybe the opportunity evidence doesn't mean much standing alone. But it doesn't stand alone in this case. Look at the evidence of motive that was presented.... You know that Edgar Payton had been standing in between [Turner] and his girlfriend for years. You recall the testimony of Mr. Payton. His goddaughter stays at his house sometimes. When she stays at his house the

defendant is not allowed to come there. He's not allowed to come to the house.... The inference you can draw from that, it's [Turner's] birthday.[5] He's not with his girlfriend. There's a man that's been standing between them for years and he comes and he's gonna eliminate that problem.

At this point the defense objected, without stating a reason, and the objection was overruled. During his closing, defense counsel argued that there was no evidence of "bad blood" whatsoever, and that "if [Payton] has in his own mind some kind of dispute with [Turner]," that was consistent with misidentification.

In rebuttal, the prosecutor returned to Turner's motive:

[M]aybe my memory is better than [defense counsel's], I don't know. But I remember Mr. Payton talking in this case. I remember him talking about how Erica and the defendant come stay in his house. And that while they, when they first started dating they lived together, but eventually he says he was tired of the way defendant was treating her and he was tired and didn't approve of the defendant's lifestyle. And he said look, [you're] barred from my house. When she's at my house you don't come. Is that a motive? That's a motive as old as time. Jealousy.

Following the rebuttal, defense counsel approached the bench and asked to "register an objection to the closing arguments that referred to the motive, the testimony about that. And [that] Mr. Payton's testimony supported a motive.... I want to

---

4. Before trial, the court had ruled, based on a proffer by the prosecutor, that the government could introduce testimony that Payton did not allow Turner to see Taylor at Payton's home because Payton did not approve of Turner's lifestyle. The trial court did not allow evidence that would have suggested *why* Pay-

ton did not approve, specifically evidence that Turner had previously struck Taylor or was involved with drugs.

5. Turner had told the police that his birthday was August 17.

renew it at this point." The trial judge responded that his "recollection is that there is testimony to that effect."

During deliberations, the jury twice sent notes indicating that they were unable to reach a verdict. Eventually, the jury convicted Turner of ADW (a lesser included offense of AWIKWA) and destruction of property, acquitting him of AWIKWA, PFCV, CPWL, UF and UA.

## II. Standard of Review

Turner argues that the trial court[6] erred or abused its discretion[7] by allowing the prosecutor to assert, during his opening statement and especially in his closing and rebuttal arguments, facts concerning Turner's motive to attack Payton that had no support in the testimony.

 Our standard of review is well established. See Finch, supra note 6, 867 A.2d at 225. When evaluating a claim of improper prosecutorial argument, we first determine whether or not the challenged argument was improper. Id. (citing Irick, supra note 6, 565 A.2d at 33). If the argument was improper, we then determine whether or not reversal is warranted,

considering (1) the gravity of the improper comments; (2) their relationship to the issue of guilt; (3) the effect of any corrective action by the trial judge; and (4) the strength of the government's case. Najafi v. United States, 886 A.2d 103, 107 (D.C. 2005) (quoting Dixon v. United States, 565 A.2d 72, 79 (D.C.1989)); see also Finch, supra note 6, 867 A.2d at 226; Lee v. United States, 668 A.2d 822, 831 (D.C. 1995).[8] If an objection preserved the claim of error, we may "not affirm the convictions unless we are satisfied that the appellant did not suffer 'substantial prejudice' from the prosecutor's improper comments." Finch, supra note 6, 867 A.2d at 227. In other words, to affirm despite the improprieties we must be able to say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." Najafi, supra, 886 A.2d at 107–08 (quoting Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); see also Anthony, supra note 8, 935 A.2d at 284; Finch, supra note 6, 867 A.2d at 226; Lee, supra, 668 A.2d at 830–31.

---

**6.** Although Turner's complaint chiefly is with the prosecutor's actions,

> it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel. Such error or abuse may, to be sure, embrace not only incorrect rulings but also, on occasion, failure to intervene sua sponte when such intervention is called for, ... or to react with sufficient promptness and vigor to prosecutorial misdeeds.... Nonetheless, absent some improper ruling or omission by the trial judge, we cannot ordinarily reverse a conviction, and our ultimate focus must therefore be on what the judge did or failed to do.

Finch v. United States, 867 A.2d 222, 225 n. 1 (D.C.2005) (quoting Irick v. United States, 565 A.2d 26, 33 (D.C.1989)).

**7.** The regulation of opening statements and closing argument is committed to the sound

discretion of the trial court. See Wright v. United States, 508 A.2d 915, 919 (D.C.1986); Clayborne v. United States, 751 A.2d 956, 968 (D.C.2000). But the trial court's discretion must be exercised in accordance with correct legal principles, and its rulings must rest on a firm factual foundation. See Johnson v. United States, 398 A.2d 354, 361–64 (D.C.1979).

**8.** In Anthony v. United States, 935 A.2d 275, 284–85 (D.C.2007), we articulated the factors as "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." (quoting Gaither v. United States, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969)). We noted, however, that the standard was substantively similar to the one articulated in Lee. Id. at 285 n. 11.

### III. Legal Analysis

#### A.

 "It is improper for an attorney to make an argument to the jury based on facts not in evidence or not reasonably inferable from the evidence." *Finch, supra* note 6, 867 A.2d at 229 (quoting *Morrison v. United States,* 547 A.2d 996, 999 (D.C.1988)). "Conversely, an attorney plainly is entitled to make reasonable comments on the evidence and urge such inferences from the testimony as will support the theory of the case." *Id.* (quoting *Coreas v. United States,* 565 A.2d 594, 601 (D.C.1989)) (internal quotation marks omitted). Thus, our first task is to determine whether the prosecutor's assertions of fact about Turner's relationship with Payton were reasonably inferable from the evidence presented at trial.

Clearing up uncertainty on one point, the government conceded at oral argument that appellant preserved his claims of error by timely objection at trial. Further, it concedes that as to what it terms "three discrete statements"—all from rebuttal argument—the prosecutor misstated the testimony, specifically in asserting that Payton testified that he "was tired of the way [Turner] was treating [Taylor]," that he "did not approve of [Turner's] lifestyle," and that he told Turner "[l]ook, [you are] barred from my house. When [Taylor]'s at my house you don't come." The government nevertheless argues that the evidence fairly allowed the prosecutor to argue that Payton's past actions toward Turner provided a motive for Turner to seek to remove him as an obstacle to his continuing relationship with Taylor, and that the misstatements of the evidence did not differ markedly enough from what could fairly be argued to justify reversal. On the latter—and critical—point, we cannot agree.

Payton's testimony supported a reasonable inference that Turner had been "messing with" Taylor for the past five or six years; that Turner had lived with Taylor and Payton at an undetermined time in another dwelling until Payton "stopped it"; and that Turner had not been to the house presently occupied by Payton in Southeast. But what the testimony did not support, besides the references to Turner's "lifestyle" and the "the way [he] was treating" Taylor, was the prosecutor's repeated assertion—from opening statement through closing and rebuttal argument—that Payton had interposed himself as a continuing sentinel between Turner and Taylor, "standing between them" by enforcing a quasi-permanent barring order ("[w]hen she's at my house you don't come") that still kept Turner from seeing Taylor as it had years earlier when Payton "stopped" their cohabitation at the Hudson Street address.[9] An argument of ongoing, present-tense vigilance by Payton ("a man that's been standing between them for years [until Turner] comes" and does the shooting) as the reason for the couple's separation and Turner's anger went well beyond testimony that at some point in the past, at a different address, Payton had barred Turner from the house and thus interrupted his relationship with Taylor.

 "We recognize, and take seriously, the Supreme Court's admonition that the court should not attach the most sinister possible interpretation to a prosecutor's remarks." *Najafi, supra,* 886 A.2d at 109 (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643–44, 94 S.Ct. 1868, 40 L.Ed.2d

---

9. Payton's statement that he "stopped it" is actually ambiguous—whether Payton stopped the relationship, or Turner's living in that particular house, is unclear—especially because whatever Payton "stopped" had lasted for "a few months" while the relationship lasted "off and on" for "maybe five, six years."

431 (1974)). Further, we have no reason to doubt that the prosecutor intended to elicit from Payton the testimony he had previewed in opening statement and, indeed, thought he had done that when he so assured the judge during the bench discussions on the point. But whether or not the prosecutor believed that evidence to support his theory existed in the record is not material. *See Gaither, supra* note 8, 134 U.S.App.D.C. at 172, 413 F.2d at 1079 ("We have found error in prosecutorial misstatements even where, as here, they were apparently made in good faith."). "It is incumbent upon the prosecutor to take care *to ensure* that statements made in opening and closing arguments are supported by evidence introduced at trial.... [T]he prosecutor had an obligation to know, and [he] should have known, that [his] description of [Mr. Payton's] testimony was untrue." *Anthony, supra* note 8, 935 A.2d at 284 (internal citation and quotation marks omitted).

**B.**

■■■■ Turning to the question of prejudice to Turner, we take note that "[i]mproper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said." *Lee, supra,* 668 A.2d at 830 (quoting *Coreas, supra,* 565 A.2d at 600 n. 8). Further, because the prosecutor's repeated embellishment of the motive theory involved "a distortion of the record," the gravity of the impropriety is substantial. *Najafi, supra,* 886 A.2d at 110. The government, although not urging plain-error review, responds that because Turner's counsel did not vigorously object or ask for a mistrial in response to the misstatements, the defense itself did not see them as significantly prejudicial, citing *Lee,* 668 A.2d at 832 ("The lack of any reaction from

[co-defendant's] attorney, and the limited reaction from [appellant's] attorney, suggest that the experienced counsel perceived little, if any, prejudice, a fact which itself suggests lack of prejudice." (citation omitted)). But *Lee* is distinguishable, because defense counsel there made only one objection "and asked for no corrective instruction." *Id.* Turner's counsel made repeated objections and requests for relief, and we will not pause to assess the "vigor" with which they were made. *Cf. Anthony, supra* note 8, 935 A.2d at 282. His counsel plainly believed the error was serious.

The reasons why, in the prosecutor's view, Payton disliked Turner—*i.e.,* his disapproval of Turner's lifestyle and how he had treated Taylor—were matters the prosecutor took pains to stress to the jury, which had heard no evidence of those reasons. But the greater prejudice to Turner came from the prosecutor's "speedy [*i.e.,* beginning with opening statement] and incessant repetition of the theme," *Najafi, supra,* 886 A.2d at 109, that Payton, and he alone, had stood between the couple for years and up to the assault, yielding an otherwise unexplained motive for Turner to resort to extreme violence against him. The prosecutor's dramatization of that motive beyond what the evidence supported was therefore central to his effort to prove Turner's identity, in turn the critical issue in the case. Although the trial judge issued the standard jury instruction that the jurors' recollection of the testimony controlled, that instruction, we conclude, was inadequate to neutralize prejudice reinforced by the repeated emphasis the prosecutor placed on the unsupported arguments. *See Morten v. United States,* 856 A.2d 595, 602 (D.C.2004). ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudi-

cial." (citation and internal quotation marks omitted)).

Finally, the government's case turned almost entirely on Payton's testimony *and* the motive Turner had to remove him from the picture. How and why Payton may have generated that motive was thus a matter on which it was important that the jury not retire to deliberations with a distorted picture of the testimony. The jury struggled to reach a verdict, convicting on only the lesser included charge of ADW and on destruction of property, and only after twice indicating to the judge their possible inability to reach a verdict. *See Barron v. United States,* 818 A.2d 987, 993 (D.C.2003). In all the circumstances, we are left with too great an uncertainty that the jury ignored the prosecutor's misstatements and relied on its own unaided recall of what Payton had said. The risk that the jury relied on statements emphasized in rebuttal argument that the testimony did not bear out is too great for us to let Turner's convictions stand.

*Reversed and remanded for a new trial.*