*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CM-0233

RONTE D. FALLEN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-DVM-000817)

(Hon. Judith A. Smith, Motion Judge; Hon. Anita Josey-Herring, Trial Judge)

(Argued November 20, 2020             Decided March 9, 2023)

*Alice Wang*, Public Defender Service, with whom *Samia Fam* and *Lee R. Goebes*, Public Defender Service, were on the brief, for appellant.

*Kristina L. Ament*, Assistant United States Attorney, with whom *Timothy J. Shea*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Elizabeth Kelley*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE and DEAHL, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion of the court by *Senior Judge* RUIZ.

Concurring opinion by *Associate Judge* MCLEESE at page 26.

RUIZ, *Senior Judge*: Appellant, Ronte Fallen, appeals the trial court's denial

of his demand for a jury trial in a prosecution for misdemeanor child sexual abuse.

Appellant argues that the combination of penalties he faced, including ten years of

sex offender registration and community notification mandated by the Sex Offender Registration Act of 1999 (SORA), is a severe penalty that warrants a jury trial under the Sixth Amendment and *Blanton v. City of North Las Vegas*, 489 U.S. 538, 543 (1989). We agree with appellant's constitutional argument and, therefore, reverse the convictions in the bench trial and remand for further proceedings.

## I.     Background

The United States charged appellant with three counts of misdemeanor child sexual abuse in violation of D.C. Code § 22-3010.01 and one count of misdemeanor sexual abuse in violation of D.C. Code § 22-3006. Appellant filed a jury trial demand arguing that the combined severity of the penalties he faced denote these are serious offenses that entitled him to a jury trial under the Sixth Amendment. Believing that this court's decision in *Thomas v. United States*, 942 A.2d 1180, 1186 (D.C. 2008), foreclosed appellant's argument, the trial court denied appellant's motion.

At the bench trial, the trial court dismissed one count of misdemeanor child sexual abuse and found appellant guilty of the remaining two counts of misdemeanor child sexual abuse and one count of misdemeanor sexual abuse. Appellant was

sentenced to three concurrent 180-day periods of incarceration, with partial execution suspended, and placed on 18 months of supervised probation. A condition of probation was compliance with SORA registration and verification requirements. The trial court certified appellant as a Class B sex offender and ordered him to register with the Court Services and Offender Supervision Agency (CSOSA) for ten years upon release from incarceration.

## II. Standard of Review

"We review the denial of a defendant's request for a jury trial *de novo*." *Smith v. United States*, 768 A.2d 577, 578 (D.C. 2001); *see also Davis v. United States*, 564 A.2d 31, 35 (D.C. 1989) (en banc) (noting that we review pure legal determinations de novo "based on an original appraisal of the record").

## III. Discussion

Appellant claims that he was constitutionally entitled to a jury trial because the combined maximum penalties for the charged crimes—180 days of incarceration, up to five years of probation and a $1,000 fine and, followed by 10 years of sex offender registration and community notification under SORA—are

severe enough to indicate that the legislature views the offenses as serious under the Sixth Amendment. The government contends that our precedent in *Thomas* forecloses appellant's claim. Even if it does not, the government argues, appellant was not entitled to a jury trial because sex-offender registration is not a penalty of conviction and is not sufficiently severe to convert an otherwise petty offense into a serious one. We conclude that appellant was entitled to a jury trial under the Sixth Amendment. We first address why *Thomas* does not foreclose appellant's claim. We decide SORA registration is a penalty that should be considered in the Sixth Amendment calculus and explain why the combination of penalties appellant faced, including SORA registration and public dissemination of identifying personal information, is a severe penalty that marks the misdemeanor child sexual abuse offenses of which he was convicted as serious, triggering the right to a jury trial.

### A. The Sixth Amendment Right to Jury Trial and *Blanton's* Presumption Against Jury Trials for Petty Offenses

The Sixth Amendment guarantees several rights in "all criminal prosecutions," including "the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. Notwithstanding the text, "[i]t has long been settled that 'there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision.'" *Blanton v. City of North Las Vegas*,

489 U.S. 538, 541 (1989) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968)). The most relevant criterion in determining whether a particular offense should be categorized as petty is "the severity of the maximum authorized penalty." *Id.* (quoting *Baldwin v. New York*, 399 U.S. 66, 68 (1970)). "In fixing the maximum penalty for a crime, a legislature 'include[s] within the definition of the crime itself a judgment about the seriousness of the offense.'" *Id.* (alteration in original) (quoting *Frank v. United States*, 395 U.S. 147, 149 (1969)).

The clearest distinction between "serious" crimes that are jury-demandable and "petty" crimes that are not, is drawn at whether the offense carries a maximum "authorized prison term of greater than six months." *Id*. at 542. As the Supreme Court has made clear, though "primary emphasis" should be placed on maximum exposure to incarceration, it is not the sole "penalty" that can denote the seriousness of an offense. *Id*. "A legislature's view of the seriousness of an offense also is reflected in the other penalties that it attaches to the offense." *Id.* Thus, courts must "examine 'whether the length of the authorized prison term *or the seriousness of other punishment* is enough in itself to require a jury trial.'" *Id.* (quoting *Duncan*, 391 U.S. at 161).

Where the maximum authorized period of incarceration is "six months or less," a defendant is entitled to a jury trial "only if he can demonstrate that *any additional statutory penalties*, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Id.* at 543 (emphasis added). "In performing this analysis, only penalties resulting from state action, *e.g.*, those mandated by statute or regulation, should be considered." *Id.* at 543 n.8. This is so because "nonstatutory consequences of a conviction 'are speculative in nature, because courts cannot determine with any consistency when and if they will occur, especially in the context of society's continually shifting moral values.'" *Id.* (quoting Douglas E. Lahammer, Note, *The Federal Constitutional Right to Trial by Jury for the Offense of Driving While Intoxicated*, 73 Minn. L. Rev. 122, 149-50 (1988)).

Applying these principles, in *Blanton* the Supreme Court considered the panoply of statutory maximum penalties faced by a person convicted of DUI: 180 days' imprisonment or "48 hours of community service dressed in clothing identifying [the defendant] as a DUI offender," a fine of $1,000, automatic loss of "his driver's license for 90 days," and a mandatory "alcohol abuse education course" at the defendant's expense. *Id.* at 539-40, 544. The court concluded these combined

penalties were not severe enough to indicate the legislature thought the offense was serious and, thus, the DUI defendant was not entitled to a jury trial. *Id.* at 543-44.

> We have summarized *Blanton*'s analytical framework as requiring
>
> > a two-step analysis: (1) identification of the penalties for conviction of an offense, and (2) an evaluation of whether the penalties, viewed together, are sufficiently severe to warrant a jury trial by comparison to the possibility of imprisonment for more than six months, which the Court has established (when considering only incarceration) as the constitutional dividing line between petty and serious offenses.

*Bado v. United States*, 186 A.3d 1243, 1252 (D.C. 2018) (en banc).

As appellant's maximum exposure to incarceration (180 days) was not greater than six months, his claim to a jury trial relies on additional penalties he faced, specifically, mandatory SORA registration.

**B.     The D.C. Sex Offender Registration Act of 1999 (SORA)**

"In 1994, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act . . . ." *In re W.M.*, 851 A.2d 431, 435 (D.C. 2004) (citing 42 U.S.C. § 14071 (repealed 2009)). "[T]he Act required each state and the District of Columbia, as a condition of receiving certain federal funds,

to establish a program of sex offender registration and community notification." *Id.* In response, "the Council of the District of Columbia enacted the SORA of 1999." *Id.*

"SORA imposes registration requirements on sex offenders based on the nature of the offenses they committed rather than on an individualized assessment of their risk of recidivism." *Id.* at 436. "Most sex offenses are within the coverage of SORA, but the Act does not apply, generally speaking, to offenses that are non-assaultive and that do not involve minors." *Id.* at 436 n.2; *see also* D.C. Code §§ 22-4001(6), (8), 22-4016. We have summarized SORA's initial requirements as follows:

> Upon registering, a sex offender is required to provide CSOSA with a photograph, fingerprints and other identifying information, including his or her "name, all aliases used, date of birth, sex, race, height, weight, eye color, identifying marks and characteristics, driver's license number, social security number, law enforcement agency identification numbers, home address or expected place of residence, and any current or expected place of employment or school attendance." . . . The period for which the offender must remain registered with CSOSA depends on the nature of that offense. Offenders who have committed the most serious offenses must register for life; all others must register for ten years or until the end of any period of probation, parole, supervised or conditional release, or convalescent leave, whichever is later.

*In re W.M.*, 851 A.2d at 436 (citations omitted) (quoting D.C. Code § 22-4007(a)(2)); *see also* D.C. Code §§ 22-4001(6), 22-4002.

SORA imposes reporting obligations throughout the period of registration. "During the applicable registration period, a sex offender must report any changes of address or other registration information." *In re W.M.*, 851 A.2d at 436 (citing D.C. Code § 22-4009(a)). "Registrants also are required to verify their addresses and other information annually, or in the case of lifetime registrants, quarterly." *Id.* (citing D.C. § 22-4008(a)(1)). "CSOSA gathers the information that it collects from sex offenders in a central registry." *Id.* at 437 (citing D.C. Code § 22-4010(a)). The duration of registration and reporting requirements depends on the classification of the offense. "Offenders who are required to register for life are in Class A. Ten-year registrants who have committed offenses against minors or sexual abuse of wards, patients, or clients are in Class B. Other ten-year registrants are in Class C." *Id.* (citing D.C. Code § 22-4011(b)(2)(A)-(C)).

In addition to requiring registration and updates for the central registry, SORA provides for public dissemination of the registrant's identity, personal characteristics, and location. "SORA authorizes the Metropolitan Police Department ('MPD') to provide both 'active notification' and 'passive notification'

to the public of information concerning registered sex offenders." *Id.* (quoting D.C. Code § 22-4011(b)(1)(A)). "'Passive notification' means 'making information about sex offenders available for public inspection or in response to inquiries.'" *Id.* at 437-38 (quoting D.C. Code § 22-4011(b)(1)(B)). "Active notification . . . refers to affirmatively informing persons or entities about sex offenders" through various means, including "community meetings, flyers, telephone calls, door-to-door contacts, electronic notification, direct mailings, and media releases." D.C. Code § 22-4011(b)(1)(A). Regulations issued pursuant to SORA provide for public disclosure of the offender's full name and aliases, date of birth, sex and race, height and weight, eye and hair color, identifying marks, home, work, and school addresses, a photograph, the offense requiring registration, court case number, date of registration, date of last verification, and whether there are any outstanding warrants for failure to comply with SORA registration. 6A D.C.M.R. § 420.1. Widespread passive notification on the internet is restricted to Class A and Class B offenders. D.C. Code § 22-4011(b)(3). Active notifications "concerning Class A, Class B, and Class C offenders may be provided to" law enforcement agencies, victims of and witnesses to a sex offender's crime, and persons about whom the Metropolitan Police Department has information indicating a specific risk from the sex offender. 6A D.C.M.R. § 417.1(a), (c)-(d). Organizations, such as schools, day care centers, and other child care centers may receive active notifications "through electronic

notification or direct mailings" upon "written request." *Id.* § 417.1(b); *see* D.C. Code § 22-4011(b)(3)(B).

## C.    Precedent on SORA in Context of the *Blanton* Presumption

No division of the D.C. Court of Appeals "will overrule a prior decision of this court," and "such result can only be accomplished by this court en banc." *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971); *see Jenkins v. United States*, 80 A.3d 978, 991 (D.C. 2013). Outside the en banc process, "[t]his court will not lightly deem one of its decisions to have been implicitly overruled and thus stripped of its precedential authority." *Lee v. United States*, 668 A.2d 822, 828 (D.C. 1995). However, this rule of appellate stare decisis does not "oblige[] us to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions or by our own supervening rulings en banc." *Id.* (first quoting *Frendak v. United States*, 408 A.2d 364, 379 n.27 (D.C. 1979); and then citing *Abney v. United States*, 616 A.2d 856, 861 (D.C. 1992)).

The trial court rejected appellant's claim on the ground that it was foreclosed by this court's decision in *Thomas*. On appeal the government continues to press this argument. As we do not sit en banc in deciding this case, we may not depart

from *Thomas* unless its philosophical underpinnings have been "substantially undermined" by an authoritative ruling. That is not a determination we make lightly, but with respect to this issue, we conclude that *Bado*, a subsequent opinion by our court, sitting en banc, permits us to consider the matter anew.

*Thomas* addressed whether SORA's registration requirement is a severe enough penalty to overcome the *Blanton* presumption under the "extremely limited plain-error standard." 942 A.2d at 1186 (quoting *Spriggs v. United States*, 618 A.2d 701, 704 (D.C. 1992)). Relying on prior cases describing SORA as "a remedial regulatory enactment, not a penal law," "we conclude[d] that the Sixth Amendment does not require that we divert . . . from the statute that calls for jury trial in only these cases where the maximum penalty exceeds 180 days." *Id*.; *see In re Doe*, 855 A.2d 1100, 1103-07 (D.C. 2004); *In re W.M.*, 851 A.2d at 441; D.C. Code § 16-705(a)-(b).

Since *Thomas*, we have had occasion to apply the *Blanton* two-step analysis under plenary appellate review. In *Bado*, the en banc court considered whether deportation is a penalty for purposes of the Sixth Amendment analysis and held that "the penalty of deportation, when viewed together with the 180-day maximum period of incarceration for misdemeanor sexual abuse of a minor, overc[ame] the

presumption that [the] appellant was charged with a petty offense and trigger[ed] the Sixth Amendment right to a trial by jury." 186 A.3d at 1262.[1] The court noted that "[t]he Supreme Court has 'long recognized that deportation is a particularly severe "penalty,"' equating it to 'banishment.'" *Id.* at 1251 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 365, 373 (2010)). Thus, *Bado* reasoned that "[l]ike incarceration, deportation separates a person from established ties to family, work, study, and community. . . . [I]t is similar 'in severity [to] the loss of liberty that a prison term entails.'" *Id.* at 1250 (third alteration in original) (quoting *Blanton*, 489 U.S. at 542).

*Bado* considered and rejected the government's argument that deportation should not be considered a penalty in the *Blanton* analysis because it was a separate civil and regulatory measure, not "punishment" for the offense. *Id*. at 1252-54. We explained that cases rejecting a jury trial right on the ground that SORA registration is not punishment but a regulatory measure misunderstood that "analysis under the Sixth Amendment guarantee to a jury trial is fundamentally different from analysis under the Fifth Amendment's Ex Post Facto and Double Jeopardy Clauses because of differences in the constitutional text and rights protected." *Id.* at 1258 n.31; *see id*. (citing *Thomas*, 942 A.2d at 1186).

---

[1] Mr. Bado also claimed that sex offender registration entitled him to a jury trial but the court, relying on the deportation penalty, did not need to address this argument. *Bado*, 186 A.3d at 1247 n.6.

We further explained that the civil/criminal and collateral/direct dichotomies were unhelpful in the Sixth Amendment analysis because deportation, even if pursued in a regulatory-type proceeding collateral to the criminal proceeding, "is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants." *Id*. at 1254 (quoting *Padilla*, 559 U.S. at 364). We reasoned that characterizing deportation as "non-criminal" was "at odds with . . . current law and practice" where deportation is an "enmeshed," "integral," and "inevitable" part of the criminal proceeding. *Id.* at 1252-54.

Finally, we rejected the argument that the question of whether deportation is a penalty under the Sixth Amendment is controlled by cases holding that deportation was not a punishment under other provisions of the Constitution, such as the Ex Post Facto clause. *Id.* at 1259-60. Instead, we reasoned that deportation is a penalty in the *Blanton* analysis even if it is not considered a punishment under other provisions of the Constitution. *Id.*

There is an obvious tension between the reasoning in *Bado* and *Thomas* because the latter considered only the regulatory classification of SORA registration

to conclude that it was not a penalty under *Blanton*.[2]  This summary consideration reflects that *Thomas* was a plain error case.  In a subsequent in-depth consideration where the issue was presented for plenary review by the court sitting en banc, *Bado*, aware of *Thomas*, eschewed the mere regulatory classification inquiry and engaged in a functional analysis grounded on the fact that the "law has enmeshed criminal convictions and the penalty of deportation," *id*. at 1252 (quoting *Padilla*, 559 U.S. at 365-66), deportation is an "integral part" of the proceeding, *id*. at 1254 (quoting *Padilla*, 559 U.S. at 364), and "attaches to a criminal conviction," *id.* at 1258, such that it should be considered in an assessment of the severity of all penalties for a criminal conviction.  Therefore, we conclude that because in *Bado* the en banc court undermined its philosophical basis, *Thomas*'s holding that SORA registration is not a penalty for Sixth Amendment purposes is not binding.

Deciding that question now, we conclude that SORA registration is a penalty under step one of the *Blanton* analysis.  Even more than deportation, SORA registration is enmeshed in the criminal proceeding; it is a direct, statutorily mandated requirement that follows ineluctably from conviction and is ordered by the trial court that imposes sentence.  *See* D.C. Code § 22-4003.

---

[2] As a result, *Thomas* did not address step two of the *Blanton* analysis—the severity of combined penalties.

**D. SORA Registration and a Maximum Sentence of 180 Days Incarceration Rebuts the *Blanton* Presumption Against a Jury Trial**

Step two of the *Blanton* analysis asks whether, viewed in combination, the maximum possible penalties that attend conviction are "serious," as compared with six months of incarceration. In this case, the question is whether SORA registration and notification, when viewed in combination with a maximum sentence of 180 days of incarceration and other attendant statutory penalties, rebuts the *Blanton* presumption. We conclude that it does.[3]

The government contends that SORA registration is not a sufficiently severe penalty because (1) it imposes no physical restraints and is less severe than probation, which the Supreme Court has stated is not sufficiently severe; and (2) the stigma and other consequences associated with child sexual abuse charges flow not

---

[3] Appellant also faced imposition of a $1,000 fine and up to five years of probation. *See* D.C. Code §§ 22-3010.01(a), 22-3006, 22-3571.01(b)(4), 16-710(b). Although part of the package of penalties we consider in assessing their overall severity in *Blanton* step two, they add relatively minor weight in the Sixth Amendment analysis. "Penalties such as probation or a fine may engender 'a significant infringement of personal freedom' but they cannot approximate in severity the loss of liberty that a prison term entails." *Blanton*, 489 U.S. at 542 (citation omitted).

from SORA's registration and notification requirements but from the conviction that is already a matter of public record. We disagree.

The Supreme Court has held that a five-year probation term is not a severe penalty. *See United States v. Nachtigal*, 507 U.S. 1, 5 (1993) (per curiam). The government's argument that SORA's registration and notification penalty resembles probation, and by analogy to *Nachtigal*, is also not severe, however, is too facile. First, the ten-year minimum—and in some cases lifetime—sex offender registration far exceeds the five-year probation period in *Nachtigal*. Moreover, in *Nachtigal* the statute authorized probation "[a]s an alternative" to incarceration. *Id*. at 2. In this case, on the other hand, probation was in addition to, not in lieu of, incarceration and the ten-year period of registration as sex offender was yet another requirement. *Blanton* directs that the applicable penalties be "viewed in conjunction with the maximum authorized period of incarceration." 489 U.S. at 543. In *Blanton*, for example, the Court assumed that the 90-day period of license suspension would run during the time of incarceration and could be reinstated as a restricted license in forty-five days; thus the suspension would be irrelevant when considering the penalties together. *Id*. at 544-45. But in this case, the registration period is not concurrent with any period of incarceration. D.C. Code § 22-4002(a). This makes the duration of SORA sex offender registration, when viewed in conjunction with

the maximum period of incarceration, significantly more burdensome than the combined penalties in *Blanton* and *Nachtigal*. As we noted in *Bado*, the duration of a penalty can "tip an otherwise presumed petty . . . offense into the serious offense category." 186 A.3d at 1250 n.13 (noting that "15-year license revocation, considered together with the maximum six month prison term, is a severe enough penalty to indicate that the Nebraska legislature considers third-offense DWI a serious offense" (quoting *Richter v. Fairbanks*, 903 F.2d 1202, 1204 (8th Cir. 1990))). The Arizona Supreme Court has also determined that "[t]he duration of the registration requirement makes this statutory consequence much more severe than a comparatively short probation period." *Fushek v. State*, 183 P.3d 536, 542 (Ariz. 2008) (en banc); *see id.* at 539 (holding that requirement of lifetime sex offender registration triggers right to jury trial under Arizona Constitution, the text of which is "virtually identical" and "construed . . . consistently" with the Sixth Amendment). To say, as the government does, that sex offender registration is less severe than probation, without exploring the specifics of the penalties that attend the particular offense, does not satisfy *Blanton*'s analysis.

Although SORA's registration and notification penalty does not, as the government points out, impose "physical restraints" like incarceration, neither the Supreme Court nor this court has held that actual physical containment is necessary

to deem a penalty sufficiently severe. If it were, only incarceration and other custodial arrangements would be considered and *Blanton*'s two-step analysis considering all penalties in conjunction with incarceration, including civil ones, would be a nullity. In *Bado*, we emphasized not only the removal of the defendant from the country but also the disruption to a person's life and the economic, family, social, and psychological harms caused by removal. 186 A.3d at 1251. As an example of psychological harm, when discussing the Court's analysis in *Blanton* of a 48-hour community service requirement while wearing clothing that identified the defendant as a DUI offender, we noted that the Court "seemingly reserve[ed] the possibility that a fuller record that showed a highly embarrassing or onerous requirement could yield a different outcome." *Id.* at 1249 & n.12 (citing *Blanton*, 489 U.S. at 545 n.10). That is the case here. Sex offender registration and notification have serious negative consequences for registrants and their families, including for their social relationships, education, employment, and psychological health. Sex-offender registrants experience "humiliation and isolation," lost or jeopardized employment, employment opportunities, and housing opportunities. *See, e.g.*, *E.B. v. Verniero*, 119 F.3d 1077, 1102 (3d Cir. 1997); J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?* 54 J.L. & Econ. 161, 168 (2011) (noting the same). Even if it does not entail custodial segregation, as does incarceration, or geographical separation, as

does deportation, sex offender registration identifies the registrant as dangerous and disseminates information to the public that allows them to be shunned and denied opportunities to live and work in their communities. These are not incidental downstream effects, but intrinsic to SORA's design to make the public aware of the identity and location of sex offenders.[4]

We are not persuaded by the government's reliance on *Smith v. Doe*, 538 U.S. 84 (2003), to argue that the social stigma and other consequences associated with sex offender registration cannot justify a jury trial. *Smith* was not a Sixth Amendment jury trial case but a challenge to retroactive application of SORA as a violation of the Ex Post Facto Clause of the Fifth Amendment. *Id*. at 92. As we have already discussed, these cases are not controlling because they arise under a different provision of the Constitution and involve a fundamentally different

---

[4] SORA registration and public dissemination can operate to deny sex offenders the benefit of statutory protections intended to help integrate persons with criminal histories into work and housing in the community. District of Columbia law prohibits employers and housing providers from "inquir[ing] about" or "requir[ing] an applicant to disclose" a criminal conviction before making a conditional offer. D.C. Code § 32-1342(b) (employment); *id.* § 42-3541.02(b)(1) (housing). A conditional offer of employment may be withdrawn only for "a legitimate business reason," *id.* § 32-1342(d), and a conditional offer of housing only if the applicant was convicted within seven years of an offense listed in the statute. *Id.* § 42-3541.02(d). Misdemeanor child sexual abuse is not one of the listed offenses. Complaints of violations are handled by the D.C. Office of Human Rights. *Id.* § 32-1342(e) (employment); *id.* § 42-3541.04(a) (housing). SORA effectively carves out an exception to these protections.

analysis that revolves around legislative intent: whether in enacting SORA the legislature crafted a civil, regulatory scheme or intended to impose a "punishment." *Id*. The question before us with respect to the right to jury trial is not whether the legislature had a punitive intent but whether the complement of statutorily imposed penalties—of which SORA registration is a part—"clearly reflect[s] a legislative determination that the offense in question is a 'serious' one." *Blanton*, 489 U.S. at 543. *Smith*'s "determination that respondents [could not] show, much less by the clearest proof, that the effects of [SORA registration] negat[ed the legislature's] intention to establish a civil regulatory scheme," 538 U.S. at 105, is therefore not dispositive of whether SORA registration, viewed in combination with the other maximum penalties for conviction of misdemeanor child sexual abuse, is sufficiently onerous for Sixth Amendment purposes. We reiterated the importance of this distinction recently in *Hickerson v. United States*, 287 A.3d 237, 241 n.4 (D.C. 2023), noting that "there are penalties that trigger the Sixth Amendment's right to a jury trial but are not punishments under the Ex Post Facto Clauses." *Id.* Thus, it is appropriate to consider the social stigma and other real-life consequences of sex offender registration to "shed[] . . . light on th[e] distinct Sixth Amendment question." *Id.*

Extensive social science research—unchallenged by the government—supports the conclusion that sex offender registration has serious negative consequences for registrants.[5] State supreme courts have reached the conclusion that SORA registration results in harm to the registrant distinct from that resulting from the underlying conviction. *See, e.g.*, *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 62 A.3d 123, 142 (Md. 2013) (concluding that "the harms caused by *dissemination* . . . render[ed]" Maryland's sex offender registration law "the equivalent of the punishment of shaming" and noting examples of lost housing "quite similar to expulsion from the community" (emphasis added)); *Doe v. State*,

---

[5] *See, e.g.*, Erika Davis Frenzel et al., *Understanding Collateral Consequences of Registry Laws: An Examination of the Perceptions of Sex Offender Registrants*, 11 Just. Pol'y J. 1, 18 (2014) ("[T]he collateral consequences [of registration] such as loss of jobs, housing, friends, and continued physical, verbal, and emotional harassment follows offenders long after they have served their prison sentences and paid their fines."); Prescott & Rockoff, *supra*, at 168 ("This publicity can lead to negative consequences for sex offenders, including loss of employment, housing, or social ties; harassment; and psychological costs such as increased stress, loneliness, and depression."); Richard Tewksbury, *Collateral Consequences of Sex Offender Registration*, 21 J. Contemp. Crim. Just. 67, 75 (2005) (finding that 42.7% of surveyed registrants had lost a job, 45.3% had lost a place to live, 47% were harassed in person, and 16% had been assaulted as a result of registration and notification); Jill S. Levenson & Leo P. Cotter, *The Effect of Megan's Law on Sex Offender Reintegration*, 21 J. Contemp. Crim. Just. 1, 49 (2005) (finding 27% of surveyed registrants lost a job, 35% had to move, 33% were threatened or harassed by neighbors, and 21% experienced property damages as a consequence of community notification); Human Rights Watch, *No Easy Answers: Sex Offender Laws in the US* 86-92 (Sept. 2007), https://www.hrw.org/sites/default/files/reports/us0907webwco ver.pdf; https://perma.cc/5C3J-B8XQ (reporting examples of "vigilante violence" resulting from community registration and notification).

189 P.3d 999, 1011 (Alaska 2008) (citing evidence that sex offenders "had lost their jobs, been forced to move from their residences, and received threats of violence *following establishment of the registry*, even though the facts of their conviction had always been a matter of public record" (emphasis added)).[6]

As the Supreme Court of Alaska explained,

> [t]here is a significant distinction between retaining public paper records of a conviction in state file drawers and posting the same information on a state sponsored website; this posting has not merely improved public access but has broadly disseminated the registrant's information, some of which is not in the written public record of the conviction.

*Doe*, 189 P.3d at 1011. The same is true here. The District of Columbia's SORA registration and notification provisions "are comparable if not identical to those imposed by the sex offender registration laws enacted in numerous other jurisdictions, including those of Alaska and Connecticut." *In re W.M.*, 851 A.2d at 435-36.

---

[6] In the *Doe* cases from Maryland and Alaska cited in the text, the supreme courts of those states applied their state constitutions and, focusing on the harm to the registrants, concluded that retroactive imposition of SORA registration was an ex post facto punishment.

The District of Columbia's online sex offender registry,[7] maintained by the Metropolitan Police Department, publishes more personal information than what would otherwise be easily accessible in public court records.[8]  In addition to the offender's name, the online sex offender registry includes the offender's photograph, physical description, date of birth, and home, work, and school addresses—none of which are easily accessible to the public in court documents.  *See* D.C. Code § 22-4007(a)(2)-(3); *In re W.M.*, 851 A.2d at 434.  It also includes the crime of conviction that led to the registration and the age of the victim.  *See* D.C. Code § 22-4007(a)(4).  It is searchable by the registrant's name and location.  This enhanced access and publicity is critical to SORA's purpose of protecting the public from sex offenders by making it easier for community members to identify and avoid offenders.  *See In re W.M.*, 851 A.2d at 438.  Accordingly, we too conclude that "the harmful effects of []SORA stem not just from the conviction but from the registration, disclosure, and dissemination provisions."  *Doe*, 189 P.3d at 1011.

---

[7] *See Sex Offender Registry*, DC.gov, https://sexoffender.dc.gov/; https://perma.cc/B3MP-SAFL (last visited Feb. 10, 2023).

[8] The public has online access to D.C. Court records through eAccess, but not everything is viewable as noted in the eAccess System User Guide.  *See* District of Columbia *eAccess User Guide* 9 (2022), https://www.dccourts.gov/sites/default/files/portal/eAccess_User_Guide_2022.pdf; https://perma.cc/VC86-62BU.

These statutory requirements are powerful evidence that the legislature views misdemeanor child sexual abuse as a serious offense. "SORA was adopted to protect the public, and especially minors, from the threat of recidivism posed by sex offenders who have been released into the community." *In re Doe*, 855 A.2d at 1102; *In re W.M.*, 851 A.2d at 441-42. Misdemeanor child sexual abuse is the only misdemeanor to qualify as a Class B registration offense—all other Class B offenses are punishable by at least five years of imprisonment, and all Class C registration offenses are punishable by at least two years of imprisonment. 28 C.F.R. § 811, App. A; D.C. Code § 22-4001(8)(D). This reflects the legislature's judgment that sex offenses involving minors "are among the most serious of all crimes both in terms of their impact on victims and in terms of the degree of fear and concern they engender in the general public." The Sex Offender Registration Act of 1999, D.C. Council Comm. on the Judiciary, Report on Bill 13-350 at 3 (Nov. 15, 1999).

The negative consequences that flow from registration as a sex offender are commensurate with the legislature's expressed view that SORA applies to the most serious offenses.

## IV.    Conclusion

The legislature has deemed that enhanced disclosure and publicity about sex offenders is critical to SORA's purpose of protecting the public by making it easier for residents to identify and, as necessary, avoid interacting with offenders.  We do not question that policy decision.  Our task is to determine whether what helps to protect the public, conversely, imposes serious negative consequences on the registrant to such an extent that the protection of the Sixth Amendment guarantee to a jury trial should be interposed before the registration requirement is triggered by conviction.  We hold that SORA's registration and notification is a *Blanton* "penalty," and that, when viewed together with the 180-day maximum period of incarceration and up to five years of probation for misdemeanor sexual abuse of a minor, sex offender registration overcomes the presumption that appellant was charged with a petty offense and triggers the Sixth Amendment right to a trial by jury.  Because appellant was denied his rightful demand for a jury trial, the convictions are reversed and the case is remanded for further proceedings.

*So ordered.*

MCLEESE, J., *Associate Judge*, concurring: I fully concur in the opinion for the court. I write separately only to acknowledge this court's prior unpublished decision in *Intriago v. United States*, Nos. 17-CM-578, 19-CO-19, Mem. Op. & J. (D.C. May 12, 2020). In that case, the court concluded that controlling precedent from this court precluded the claim that the requirement of sex-offender registration entitles defendants charged with misdemeanor sexual abuse to a jury trial. *Id.* at 3-5. That unpublished decision is not binding precedent. *E.g.*, *O'Rourke v. D.C. Police & Firefighters' Ret. & Relief Bd.*, 46 A.3d 378, 383 n.9 (D.C. 2012); D.C. App. R. 28(g). I was a member of the division that decided *Intriago*. On further reflection in this case, however, I have come to agree that our prior decisions in this area have been substantially undermined by our en banc decision in *Bado v. United States*, 186 A.3d 1243 (D.C. 2018). A petition for rehearing en banc is pending in *Intriago*, and the court in that case will need to address that petition in light of our precedential decision in the present case.