*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CO-0241

MILTON NELSON WARD, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2011-CF2-005519)

(Hon. Robert E. Morin, Trial Judge)

(Argued December 11, 2020                         Decided July 18, 2024)

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam* and *Alice Wang*, both with the Public Defender Service, were on the briefs, for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Matthew M. Graves*, *Jessie K. Liu*, and *Channing D. Phillips*, United States Attorneys, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Lindsey Marcus*, Assistant United States Attorneys, were on the briefs, for appellee.

Before FISHER, THOMPSON, and GLICKMAN, *Senior Judges*.[*]

_____

[*] Judge Thompson and Judge Glickman were Associate Judges of the court at the time of argument. Judge Thompson began her service as a Senior Judge on February 18, 2022, and Judge Glickman began his service as a Senior Judge on December 21, 2022.

FISHER, *Senior Judge*: This case returns to us upon remand from the United States Supreme Court. On April 28, 2017, we affirmed the judgment of the trial court denying appellant Milton Nelson Ward's request to withdraw his guilty plea. Mr. Ward petitioned for a writ of certiorari, which the Supreme Court granted. The Court vacated the judgment of this court and remanded this matter for further consideration in light of its recent opinion in *Class v. United States*, 583 U.S. 174 (2018). As the parties litigated the viability of Mr. Ward's Second Amendment claim in light of *Class*, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), prompting additional briefing in this appeal. For the reasons explained below, we vacate the trial court's order and remand for further proceedings consistent with this opinion.

## I. Factual Background and Procedural History
### A. Mr. Ward is Convicted of Possessing an Unregistered Firearm

On March 27, 2011, Mr. Ward, a Virginia resident at the time, was involved in a multi-vehicle collision in the District of Columbia. One of the police officers who responded to the scene of the crash observed a loaded handgun and a second loaded magazine in Mr. Ward's glove compartment.

A grand jury indicted Mr. Ward for carrying a pistol without a license outside his home or place of business (CPWL), possession of an unregistered firearm (UF),

and unlawful possession of ammunition (UA).[1]  In return for the government's agreement to dismiss the CPWL and UA charges, Mr. Ward pled guilty to UF on June 24, 2011.  On the same day, the trial court sentenced him to 30 days' incarceration and nine months' unsupervised probation, but suspended execution of the jail term.[2]  Mr. Ward did not appeal his UF conviction, which became final later in 2011, upon expiration of the time for filing a petition for certiorari.  *See Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987).

**B.  The Superior Court Denies Mr. Ward's Motion to Withdraw His Plea; This Court Affirms**

Four years later, on April 22, 2015, Mr. Ward filed a pro se "motion to withdraw guilty plea pursuant to Superior Court Rules of Criminal Procedure 32(e) and or D.C. Code § 23-110."  He contended that: he "was denied his Sixth Amendment right to effective assistance of counsel"; "the charge(s) were the result of an unreasonable search and seizure in violation of the Fourth Amendment"; "the

---

[1] D.C. Code §§ 7-2502.01 (UF), 7-2506.01(s) (UA), 22-4504(a) (CPWL) (2009 Supp.).  Although the charging document cites the 2001 versions of these statutes, each had been amended in 2009.  Firearms Control Amendment Act of 2008, D.C. Law 17-372, 56 D.C. Reg. 1365 (Mar. 31, 2009) (amending UF and UA provisions); Inoperable Pistol Amendment Act of 2008, D.C. Law 17-388, 56 D.C. Reg. 1162 (May 20, 2009) (amending CPWL provision).

[2] Mr. Ward later asserted, in an affidavit in support of the motion now on appeal, that he had informed his trial-level counsel of a desire to pursue a Second Amendment defense.  However, neither he nor his counsel referred to the Second Amendment during his plea or sentencing.

plea was not made knowingly and voluntarily"; and "the relevant statute infringes upon [his] right to keep and bear arms and therefore violates the Second Amendment of the U.S. Constitution," meaning that "the District of Columbia could not constitutionally prosecute." He appended an affidavit with factual allegations in support of his claims. The government opposed Mr. Ward's motion.

On February 11, 2016, the trial court issued an order denying the motion. The order explained that Mr. Ward could not seek relief under D.C. Code § 23-110 because it only applies to defendants who remain "in custody"; determined that Mr. Ward's allegations of defects in the proceedings were meritless; and then examined his arguments under the "manifest injustice" standard of Super. Ct. Crim. R. 32(e), the contents of which have since been relocated to Rule 11(d).

The court concluded that Mr. Ward had failed to demonstrate manifest injustice for three reasons. First, Mr. Ward had "no viable claim of innocence" because he had "not stated that he [was] legally innocent of the charge to which he pled" and had "affirmed to the court that the proffer [at his plea colloquy] was accurate, including the fact that he was in possession of an unregistered firearm." Second, Mr. Ward had "waited nearly four years to assert his motion to withdraw a guilty plea," a delay that the court determined did not reflect a sufficiently "swift change of heart" to warrant relief under the manifest injustice standard. *See White*

*v. United States*, 863 A.2d 839, 844 (D.C. 2004) (quoting *Gooding v. United States*, 529 A.2d 301, 307 (D.C. 1987)). Finally, the court decided that Mr. Ward had not been denied the effective assistance of counsel, noting in its analysis that counsel had not been ineffective for failing to file a motion to suppress evidence because Mr. Ward had "not shown that there was anything of substance" to his Fourth Amendment claim "other than his speculation that witnesses might have corroborated his version of the events." The order did not address Mr. Ward's argument that his prosecution violated the Second Amendment.[3] Mr. Ward then filed a timely appeal to this court.

On April 28, 2017, this court affirmed the denial of Mr. Ward's motion to withdraw his plea. *Ward v. United States*, No. 16-CO-241, Mem. Op. & J. at 5 (Sep. 28, 2017) ("*Ward* MOJ"). In addition to deciding that the trial court had appropriately applied the "manifest injustice" standard and had not abused its discretion in denying the ineffective assistance of counsel claim, we concluded that Mr. Ward's "stand-alone" Second and Fourth Amendment claims were

---

[3] In any event, at the time the order was issued, the law of the District of Columbia unambiguously held that a guilty plea waived a Second Amendment challenge to a conviction. *E.g.*, *Sims v. United States*, 963 A.2d 147, 149 (D.C. 2008) ("[A] panel of this court may not ignore the court's own past decisions holding that Second Amendment claims . . . may be . . . waived by a defendant's guilty plea.").

"foreclose[d]" by appellant's unconditional guilty plea. *Id.* In particular, we noted that a guilty plea waives a Second Amendment challenge:

> Regarding appellant's argument that the government could not "constitutionally prosecute" him, we have noted that "[e]ntry of a valid guilty plea . . . does not foreclose *jurisdictional* attacks which assert that the state could not constitutionally prosecute." However, we have rejected the argument that a Second Amendment challenge is the type of "jurisdictional infirmity" that cannot be waived by a guilty plea.

*Ward* MOJ at 6 n.5 (citations omitted) (first quoting *Gooding*, 529 A.2d at 304 n.4; then quoting *Sims v. United States*, 963 A.2d 147, 149 (D.C. 2008); and then citing *Smith v. United States*, 20 A.3d 759, 762 n.5 (D.C. 2011)).

### C. The Supreme Court Vacates Our Judgment and Remands; This Court Orders Further Argument and Briefing in Light of New Supreme Court Precedent

On October 1, 2018, the Supreme Court remanded Mr. Ward's case for further consideration, *Ward v. United States*, 139 S. Ct. 66 (2018) (mem.), in light of its recent opinion in *Class v. United States*, 583 U.S. 174 (2018), a case in which the Court held that a guilty plea by itself did not foreclose a federal defendant's direct appeal based on a challenge to the constitutionality of the statute of conviction. We ordered supplemental briefing from the parties, appointed counsel for Mr. Ward, and heard oral arguments.

After this court heard the parties' arguments in light of *Class*, the Supreme Court granted certiorari in *New York State Rifle & Pistol Ass'n v. Corlett* to consider "[w]hether [New York's] denial of the petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment." *N.Y. State Rifle & Pistol Ass'n v. Corlett*, 141 S. Ct. 2566 (2021) (mem.). We held this appeal in abeyance pending disposition of that case. After the Supreme Court issued its decision on June 23, 2022, in the by-then re-captioned *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, we ordered supplemental briefing, which the parties completed on November 28, 2022.

## II. Analysis

### A. *Class* and *Bruen*

As the Supreme Court's remand in light of *Class* and our decision to order supplemental briefing following *Bruen* indicate, the relevant legal landscape has evolved considerably since Mr. Ward's 2011 conviction. And it continues to evolve. *See United States v. Rahimi*, 602 U.S. ___, 2024 WL 3074728 (June 21, 2024) (addressing Second Amendment challenge to conviction).

### 1. *Class*

In *Class*, the Supreme Court addressed "[t]he question [of] whether a guilty plea by itself bars a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal," and "h[e]ld that it does not." 583 U.S.

at 178. The case concerned a defendant who was charged in federal district court for possession of a firearm on the grounds of the United States Capitol. After the court denied Mr. Class's Second Amendment and due process challenges, he agreed to plead guilty to the possession charge in exchange for related charges being dropped. *Id.* at 176. The written plea agreement stipulated that Class waived certain rights, including the right to bring "most collateral attacks on the conviction and sentence," and "expressly enumerated categories of claims that Class could raise on appeal," but "said nothing about the right to raise on direct appeal a claim that the statute of conviction was unconstitutional." *Id.* at 177. "Several days" after the plea and sentencing, "Class appealed his conviction." *Id.* The D.C. Circuit affirmed his conviction, holding that "Class could not raise his constitutional claims because, by pleading guilty, he had waived them." *Id.* at 178. The Supreme Court granted certiorari, and reversed and remanded.

Invoking "an understanding of the nature of guilty pleas which, in broad outline, stretches back nearly 150 years," the Court stated that a valid guilty plea does not bar a direct appeal when it "call[s] into question the Government's power to 'constitutionally prosecute'" a defendant. *Class*, 583 U.S. at 180-82 (quoting *United States v. Broce*, 488 U.S. 563, 575 (1989)). Instead, a defendant may proceed with such an appeal if he or she "seeks to raise a claim which, 'judged on its face' based upon the existing record, would extinguish the government's power to

'constitutionally prosecute' the defendant if the claim were successful." *Id.* at 183 (quoting *Broce*, 488 U.S. at 575). However, the Court also clarified that a guilty plea does waive constitutional challenges based on trial-related and case-related government conduct or "any claim that would contradict the 'admissions necessarily made upon entry of a voluntary plea of guilty.'" *Id.* at 183 (quoting *Broce*, 488 U.S. at 573-74).[4]

The parties dispute the extent to which *Class* controls the present case. Mr. Ward contends that the holding reaches his appeal, meaning that he can challenge the constitutionality of his UF conviction despite the fact that he pled guilty. Noting that the Supreme Court's opinion uses the term "direct appeal" in key passages, the government counters that *Class* is limited to direct appeals by federal defendants and does not apply to a collateral attack or to a defendant convicted in the Superior Court.

## 2. *Bruen*

The Supreme Court's decision in *Bruen* cannot readily be summarized in a few sentences or even a few paragraphs, so the parties and the trial court undoubtedly

_____

[4] Although the *Class* Court traced this "understanding of the nature of guilty pleas" at least as far back as 1869, it adopted the 1983 Federal Rules Advisory Committee's reference to the "*Menna–Blackledge* doctrine" to describe the rule regarding preservation of constitutional challenges to guilty pleas. This doctrine is named for two cases, *Menna v. New York*, 423 U.S. 61 (1975) (per curiam), and *Blackledge v. Perry*, 417 U.S. 21 (1974), in which the Supreme Court held that a guilty plea did not foreclose a constitutional challenge under certain circumstances.

will carefully study the opinion itself. In brief, however, the Court "h[e]ld that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. In such circumstances, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." The Court explained that "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

The Court also discussed the methodology with which courts are to examine Second Amendment challenges to government actions and regulations. If the defendant is an "ordinary, law-abiding, adult citizen[]," and so "part of 'the people' whom the Second Amendment protects," the court "turn[s] to whether the plain text of the Second Amendment protects [the defendant's] course of conduct." *Id.* at 31-32.[5] If "[t]he Second Amendment's plain text . . . presumptively guarantees [the defendant] a right to 'bear' arms in public for self-defense," then "the burden falls on [the government] to show that [its regulation] is consistent with this Nation's

_____

[5] *But see United States v. Rahimi*, 602 U.S. ___, 2024 WL 3074728 at *11 (June 21, 2024) (cautioning that *Heller* and *Bruen* "did not define the term ['responsible'] and said nothing about the status of citizens who were not 'responsible.'").

historical tradition of firearm regulation. Only if [the government] carr[ies] that burden can [it] show that the pre-existing right codified in the Second Amendment . . . does not protect [the defendant's] course of conduct." *Id*. at 33-34.

In assessing whether a firearm regulation is consistent with historical tradition, *Bruen* advised that courts will often have to analogize the challenged regulation to the firearms regulations that were in place when the Second Amendment was ratified.[6] "[D]etermining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" 597 U.S. at 28-29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). Although the Court did "not . . . provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court explained that, "[f]or instance, when a challenged regulation addresses a general societal problem that has persisted since

_____

[6] A concurrence observed that the majority opinion did not settle an "'ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791." *Bruen*, 597 U.S. at 82 (Barrett, J., concurring) (quoting maj. op. at 37). This observation is not relevant to the District of Columbia, which is treated as part of the sovereign United States rather than a state covered by the Fourteenth Amendment.

the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. Similarly, historical regulations that "addressed the societal problem, but did so through materially different means, . . . could be evidence that a modern regulation is unconstitutional" and "attempt[s] to enact analogous regulations during this timeframe" that "were rejected on constitutional grounds . . . surely would provide some probative evidence of unconstitutionality." *Id.* at 26-27.

Conducting this inquiry, the *Bruen* Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10. That right is not unlimited, however, and "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 38. While recognizing that traditional regulations included restrictions on firearms in "sensitive places," the Court did not "comprehensively define" that term. *Id.* at 30. It did acknowledge that jurisdictions could restrict firearms in "legislative assemblies, polling places, and courthouses," but cautioned that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law

enforcement defines the category of 'sensitive places' far too broadly." *Id.* at 30-31. The Court further held that a licensing regime in which a state "issues public-carry licenses only when an applicant demonstrates a special need for self-defense . . . violates the Constitution," and contrasted such regimes with those in which "the government issues licenses to carry based on objective criteria," without expressly holding that such "shall-issue" regimes are constitutional. *Id.* at 11.

## B. Firearms Provisions in Force at the Time of Mr. Ward's Offense

At the time of Mr. Ward's offense, District of Columbia law prohibited him from possessing a firearm while in the District. The post-*Heller*[7] regime then in place generally prohibited registration of firearms, but with exceptions that included "[a]ny person who seeks to register a pistol for use in self-defense within that person's home," D.C. Code § 7-2502.02(a)(4)(c) (2009 Supp.), so long as such person met certain other requirements. In addition to providing information regarding criminal background, physical capacity, and other criteria, pistol

_____

[7] *District of Columbia v. Heller*, 554 U.S. 570 (2008), is the landmark decision in which the Supreme Court struck down District of Columbia firearm regulations that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628. The decision held "that the Second Amendment conferred an individual right to keep and bear arms" and that "the District's requirement . . . that firearms in the home be rendered and kept inoperable at all times . . . makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 595, 630.

registration applicants also had to provide "[r]esidency verification, such as a District of Columbia driver's license or identification card, a current rental agreement, or a deed to property that includes a home," 24 D.C.M.R. § 2320.3(c)(1)(C), effectively prohibiting non-residents from possessing firearms. The District did not provide for concealed-carry licensing (or reciprocity for licenses from other states) from mid-2009 until 2015. *See* Inoperable Pistol Amendment Act of 2008, D.C. Law 17-388, § 2(f), D.C. Reg. 56-1162 (May 20, 2009) (repealing concealed-carry license provision); D.C. Code § 22-4506 (authorizing issuance of concealed-carry licenses); 24 D.C.M.R. § 2332 (2015 ed.) (establishing requirements for concealed-carry license). Even when licenses were issued, they did not authorize open carry. *See* D.C. Code § 22-4504 (prohibiting the carrying of a firearm "either openly or concealed on or about [the] person" without a license). Of course, the laws regulating firearms have changed significantly since Mr. Ward was arrested.

Mr. Ward would have been authorized to transport his firearm through the District of Columbia under certain conditions. Since 1986, the federal government has authorized the interstate transportation of firearms "for any lawful purpose from any place where [the person] may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," with important restrictions on storage and security of the weapon while in transit. 18 U.S.C. § 926A.

Transportation may be lawful "if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle," with the additional requirement that "in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console." *Id.*

The District of Columbia authorized transportation of a firearm "[w]hile it is being transported for a lawful purpose as expressly authorized by District or federal statute and in accordance with the requirements of that statute." D.C. Code § 22-4504.01(4). Like the federal statute, D.C. law required that "[i]f the transportation of the firearm is by a vehicle, the firearm shall be unloaded, and neither the firearm nor any ammunition being transported shall be readily accessible or directly accessible from the passenger compartment of the transporting vehicle," and that "[i]f the transporting vehicle does not have a compartment separate from the driver's compartment, the firearm or ammunition shall be contained in a locked container other than the glove compartment or console, and the firearm shall be unloaded." D.C. Code § 22-4504.02(b) (2009 Supp.); *see also* 24 D.C.M.R. § 2320.9 to 2320.10.

The parties dispute whether *Bruen* establishes that "the Second Amendment would have required the District to allow nonresidents to apply for registration certificates," and whether *Bruen* rendered the District's entire firearm registration regime unconstitutional.

## C. The Parties' Proposed Dispositions

As an initial matter, nothing in *Class* disturbs the reasoning in those parts of the *Ward* MOJ concerning the Fourth and Sixth Amendment claims or the manifest injustice standard as the trial court applied it to those claims. *Ward* MOJ at 3-9. When this court ordered supplemental briefing in light of *Class*, we asked the parties to address, along with three other questions, whether "*Class* relate[s] solely to the Second Amendment issue raised by appellant," but advised that the parties were "not otherwise limited." *Ward v. United States*, 16-CO-241, (Order of Mar. 12, 2019). Mr. Ward did not press his Fourth and Sixth Amendment arguments, and his reply did not push back on the government's statement that "appellant apparently concedes [that] his guilty plea rendered his Fourth Amendment claim 'irrelevant.'" Mr. Ward has forfeited any Fourth or Sixth Amendment arguments by not pursuing them, and the only remaining dispute concerns whether the Second Amendment issue must be addressed as if this case were on direct appeal, as a motion to withdraw the guilty plea, or as a collateral attack on the validity of the plea. As the Supreme

Court introduced developments in the relevant law, the parties' positions have evolved as well.

After *Class*, but before *Bruen*, Mr. Ward argued that *Class* meant that he could bring a direct challenge to the constitutionality of his conviction despite his guilty plea, and that this court should hold that his conviction violated the Second Amendment. Alternatively, citing our decision in *Magnus v. United States*, 11 A.3d 237 (2011), he asserted that, regardless of *Class*, he was entitled to relief because the purportedly unconstitutional nature of the conviction meant that his plea was "not voluntarily or intelligently made." *Magnus*, 11 A.3d at 240. Mr. Ward asked us to reverse the order denying his motion to withdraw his plea and added that if this court was not satisfied that he had demonstrated his qualification to register a firearm, we should remand to the trial court to conduct a hearing on that issue.

The government contended that *Class* did not apply to "a D.C. Code offender collaterally attacking his UF conviction" because its "no-waiver rule is restricted to federal defendants pursuing constitutional claims on direct appeal" and that even if it did apply to D.C. Code movants, it did not apply retroactively. Regarding Mr. Ward's argument under *Magnus*, the government asserted that he could not challenge the voluntary and intelligent nature of his plea because he had not made the required showing that "a subsequent court ruling ma[de] clear that the

defendant's charged conduct was constitutionally protected." *Magnus*, 11 A.3d at 244. The government asked this court to affirm the trial court's order.

There things stood until the Supreme Court decided *Bruen*. In his supplemental brief following the Court's decision in that case, Mr. Ward insisted that, "[b]ecause *Bruen* makes clear that this Court should grant relief under *Magnus*, it [was] unnecessary to reach the other issues briefed by the parties." He "maintain[ed] that he may also challenge the constitutionality of his conviction under *Class*," but posited that "this Court need not address that claim if it grants relief under *Magnus*." He asked that we "reverse the order denying Mr. Ward's motion to withdraw his plea and remand with instructions to permit withdrawal of the plea as not knowing and intelligent." The government changed course from its pre-*Bruen* request for an affirmance, stating that, "[i]n light of *Bruen*'s holding that the Second Amendment right applies outside the home or business, the United States agrees with Ward's suggestion . . . that this Court should reverse the trial court's order denying his withdrawal motion and remand the matter."

Although the parties agree on the need for a remand, they disagree on the inquiry the trial court should conduct. Mr. Ward believes that the trial court should rule that his conviction was not knowing and voluntary and grant his motion to withdraw the plea. The government seeks a hearing "so that Ward might have the

opportunity to 'demonstrate[] that his conduct was not criminal under the law as later interpreted by the [Supreme] Court,'" but also now argues that Mr. Ward "procedurally defaulted his current challenge," meaning "he must demonstrate either (1) 'cause' and 'actual prejudice,' or (2) that he is 'actually innocent.'" *Magnus*, 11 A.3d at 244 (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)). Mr. Ward contends that the government waived "its belated claim of procedural default" and that, even if it did not, the claim is "meritless." He explains that "this Court has held that non-jurisdictional challenges to guilty pleas must be raised in a motion to withdraw, and will not be heard on direct appeal," meaning that "[a]ny direct appeal by Mr. Ward, as the government expressly conceded at oral argument, 'would have been dismissed—for sure.'"

## D. Whether *Class* Revives Mr. Ward's Second Amendment Claim

Before *Class*, it was the law of this jurisdiction that Second Amendment challenges were waived by a guilty plea; absent intervention by this court sitting en banc or the Supreme Court, any panel of this court would be bound by that precedent, which would render irrelevant any potential effect of *Bruen*. *See Smith v. United States*, 20 A.3d 759, 762 n.5 (D.C. 2011) ("recogniz[ing] the waiver exception set forth by the Supreme Court" in *Menna* and *Blackledge* but deciding that the "appellant's . . . Second Amendment claims do not fit the *Blackledge*/*Menna*

exception"); *see also Sims*, 963 A.2d at 149. But if the "philosophical basis [of the waiver rule] has been substantially undermined by subsequent Supreme Court decisions or by our own supervening rulings en banc," *see Fallen v. United States*, 290 A.3d 486, 493 (D.C. 2023) (quoting *Lee v. United States*, 668 A.2d 822, 828 (D.C. 1995)), then Mr. Ward may be able to present his Second Amendment challenge.

The government insists that *Class* only applies to the narrow circumstances of a federal defendant who pursues a direct appeal from a conviction resulting from a guilty plea. Because Mr. Ward was convicted under District of Columbia law and challenged his conviction on collateral attack, the government argues that his case is beyond the ambit of *Class*. The government emphasizes the Court's use of the phrases "federal defendant" and "direct appeal" throughout the *Class* opinion, and argues that the Court's discussion of the Federal Rules of Criminal Procedure is essential to its holding.

We understand *Class* differently. Rather than articulating a narrow holding confined to the federal court context, the decision "reflect[s] an understanding of the nature of guilty pleas" that transcends the particulars of the rules that applied in Mr. Class's case. *Class*, 583 U.S. at 180. The Supreme Court stated that "[a] guilty plea does not bar a direct appeal" where the appellant's claims "challenge the

Government's power to criminalize [the defendant's] (admitted) conduct [and] . . . thereby call into question the Government's power to 'constitutionally prosecute' him." *Id.* at 181-82 (quoting *Broce*, 488 U.S. at 575). This reasoning sweeps beyond the narrow circumstances of a federal appellant on direct appeal; indeed, as Mr. Ward points out, the Court viewed *Class* as refining a doctrine rooted partly in *Blackledge v. Perry*, 417 U.S. 21 (1974), a case that itself concerned a collateral challenge. The Court also drew from a state, rather than federal, case, *Commonwealth v. Hinds*, 101 Mass. 209 (1869), for the proposition that "if the facts alleged and admitted do not constitute a crime against the laws of the Commonwealth, the defendant is entitled to be discharged." *Class*, 583 U.S. at 180 (quoting *Hinds*, 101 Mass. at 210). The Court's reliance on these cases belies the notion that its holding is limited to the context of a direct appeal under the Federal Rules of Criminal Procedure. Nor do *Class*'s allusions to the "existing record" suggest that the Court's reasoning is confined to direct appeals. Rather, the Court contrasted "claims [that] can be 'resolved without any need to venture beyond th[e] record,'" *id.* at 181 (quoting *Broce*, 488 U.S. at 576), with those that "contradict the terms of the indictment or the written plea agreement," *id.*, and so require fact-finding.

Class clarifies that a guilty plea does not waive a constitutional "challenge [to] the Government's power to criminalize [a defendant's] (admitted) conduct." *Id.*

at 181. By applying this holding to allow a defendant to challenge his conviction on Second Amendment grounds, the Supreme Court "substantially undermined" the "philosophical basis" of our precedent holding that such challenges were deemed waived by a guilty plea. *See Fallen*, 290 A.3d at 493 (quoting *Lee*, 668 A.2d at 828). Accordingly, we conclude that *Class* applies to the present litigation and that Mr. Ward's guilty plea did not waive or forfeit his right to raise a Second Amendment challenge to his conviction.

### E. Whether Constitutional Challenges Preserved under *Class* are Treated as Direct Appeals

Mr. Ward would have us decide the Second Amendment question—which the trial court never considered—and remand with instructions to allow him to withdraw his plea. In effect, he insists that *Class* requires us to treat his constitutional challenge as akin to a direct appeal of his conviction. While we agree with Mr. Ward that *Class*'s holding on the effect of a guilty plea is not limited to those challenges presented on direct appeal, we disagree with his argument that the Court's allusions to direct appeals require us to treat his challenge as though it had been brought on direct appeal of the conviction.

The Supreme Court has long recognized "a distinction between a case pending on direct review and a case on collateral attack." *Shea v. Louisiana*, 470 U.S. 51, 59 (1985); *see also United States v. Frady*, 456 U.S. 152, 166 (1982) ("reaffirm[ing]

the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal"). Because "[s]omewhere, the closing must come," the Court permits restrictions and threshold showings for collateral movants that are not required of litigants on direct appeal. *Shea*, 470 U.S. at 60; *see also Montgomery v. Louisiana*, 577 U.S. 190, 205 (2016) (acknowledging "a State's weighty interests in ensuring the finality of convictions and sentences"). *Class* did not *sub silentio* require us to contravene this time-honored emphasis on the finality of convictions. Although *Class* revives Mr. Ward's Second Amendment claim, it does not affect the mechanism in place for addressing an un-waived constitutional claim for which only collateral attack is normally available.

References in *Class* to direct appeals stem from the fact that the Federal Rules of Criminal Procedure allow convicted defendants who have pled guilty to appeal their convictions. But that is not true in the courts of the District of Columbia: such a defendant may move to withdraw her plea but may not directly appeal her conviction. *Compare* Fed. R. Crim. P. 11(e) ("After the court imposes sentence, the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack.") *with* Super. Ct. Crim. R. 11 comment to 2016 amendments (describing "the difference between the federal and Superior Court provisions: post-sentence plea withdrawal is not permitted by the

federal rule, but is permitted by this rule to correct manifest injustice"), *and Lorimer v. United States*, 425 A.2d 1306, 1309 (D.C. 1981). The Supreme Court's holding in *Class* concerning the nature of a guilty plea in no way dictates that local court systems must adopt the specific procedures followed in that case.

In *Lorimer*, we observed that "post-conviction relief must . . . be pursued only by the appropriate procedures," and declined to consider the merits of an appellant's direct appeal from a conviction obtained through a guilty plea because "the challenge to the guilty plea in [that] case, made for the first time on direct appeal from the conviction, with no motion below . . . , [was] not properly before this court." 425 A.2d at 1308-09. We reaffirmed this understanding of the limitation on direct appeals challenging guilty pleas in *Wallace v. United States*, explaining that this court "has 'refus[ed] to exercise our jurisdiction to hear a challenge to a guilty plea' outside the context of an appeal from denial of a motion to withdraw a guilty plea." 936 A.2d 757, 762 (D.C. 2007) (quoting *Lorimer*, 425 A.2d at 1309 n.6). Until the trial court considers Mr. Ward's Second Amendment argument in the proper procedural vehicle, there is nothing properly before this court for us to review.[8]

_____

[8] As we explain below, the first inquiry in a Second Amendment challenge is whether the defendant was an "ordinary, law-abiding, adult citizen[]," and so "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31-32. Because the current record does not resolve this inquiry, for which Mr. Ward, as the

In light of this difference in the "appropriate procedures," as explained in *Lorimer* and *Wallace*, Mr. Ward correctly states that he "undisputedly could not have raised his Second Amendment claim on direct appeal." For this same reason we cannot say that Mr. Ward committed a procedural default by failing to appeal his conviction.[9] Procedural default, then, is not at issue.

In light of *Class*, Mr. Ward's guilty plea did not waive his Second Amendment challenge to his UF conviction. But he raised it years after his conviction had become final, and the trial court did not address this constitutional challenge before denying relief. A remand is appropriate so that the parties may present arguments in light of intervening developments in Second Amendment law and so that the trial court may address the factual and legal underpinnings of these arguments.

---

movant, has the burden, he likely would not prevail if we were to treat the current appeal as a direct appeal of his conviction.

[9] Although in *Magnus* we remanded for an inquiry into the possibility of a procedural default under similar circumstances, Mr. Ward persuasively points out that the court, in that case, "did not consider, and therefore could not have decided, how the unavailability of a direct appeal bears on procedural default." Indeed, the parties did not brief the issue in *Magnus*, whereas Mr. Ward has explained in two rounds of supplemental briefing why *Lorimer* and *Wallace* foreclose any argument that he could have defaulted by failing to take a direct appeal.

## IV. The Inquiry on Remand

The trial court assessed Mr. Ward's motion to withdraw under the "manifest injustice" standard contained in Super. Ct. Crim. R. 11(d), but "we have reserved ruling on whether [an in-custody requirement] is implicit [in that rule]." *Magnus*, 11 A.3d at 245 (citing *Thomas v. United States*, 766 A.2d 50, 52 (D.C. 2001)). That uncertainty presents no barrier to holding a hearing, however, "because *coram nobis* relief unquestionably is available to petitioners who are no longer in custody." *Id.* (citing *United States v. Morgan*, 346 U.S. 502, 504-05 (1954)).[10]

To demonstrate entitlement to relief via the writ of coram nobis, Mr. Ward will need to meet the writ's requirements: that

> (1) the trial court be unaware of the facts giving rise to the petition; (2) the omitted information be such that it would have prevented the sentence or judgment; (3) petitioner be able to justify the failure to provide the information; (4) the error be extrinsic to the record; and (5) the error be of the most fundamental character.

*Bangura v. United States*, 248 A.3d 119, 121 (D.C. 2021) (quoting *United States v. Hamid*, 531 A.2d 628, 634 (D.C. 1987)). Despite the wording of the first prong,

_____

[10] Although Mr. Ward sought "relief under Rule 11 or via writ of error *coram nobis*" in his post-*Class* brief, in his post-*Bruen* brief he only invoked *Magnus*, with its emphasis on the availability of coram nobis relief to a movant in a similar posture. The government does not dispute that coram nobis is the appropriate mechanism for any potential relief.

coram nobis relief "is no longer limited to the correction of purely factual errors," and we have allowed a petitioner who had pleaded guilty to pursue this writ while attacking his convictions in light of subsequent Second Amendment rulings. *Magnus*, 11 A.3d at 246. Because we were remanding for a hearing, it was premature to decide whether Mr. Magnus had met the rigorous requirements for coram nobis relief, see *id*. at 245, but we did observe that "[a] conviction for conduct that is not criminal, but is instead constitutionally-protected, is the ultimate miscarriage of justice," *id*. at 246-47.[11]

Whether the final two requirements for a writ of error coram nobis are satisfied rests on whether the methodology laid out in *Bruen* leads to the conclusion that Mr. Ward's conviction violated the Second Amendment. That is a question for the trial court to consider in the first instance, after the parties have been allowed to submit evidence and legal arguments. However, given the novelty of that methodology to this jurisdiction, it may be helpful to identify key steps and

_____

[11] We also noted that coram nobis relief is reserved for circumstances "where no other remedy is available." *Magnus*, 11 A.3d at 245. In order to satisfy this requirement, it may become necessary to decide whether there is an in-custody requirement for obtaining relief under Rule 11. But this determination should only affect the form of relief that is available. If Mr. Ward has suffered "the ultimate miscarriage of justice," he surely will have established the "manifest injustice" required to permit withdrawal of his plea.

considerations of that constitutional inquiry, to limit the possibility of a further, avoidable remand.

## A. Whether Mr. Ward is Entitled to Second Amendment Protection

For a defendant to bring a Second Amendment challenge in this jurisdiction, he must not be "disqualified from the exercise of Second Amendment rights" by reason of factors such as "age, criminal history, mental capacity, and vision." *Plummer v. United States*, 983 A.2d 323, 342 (D.C. 2009).[12] *Bruen* does not appear to have disturbed this practice; it begins its analysis with the observation that it was "undisputed" that the petitioners were "two ordinary, law-abiding, adult citizens" and "part of 'the people' whom the Second Amendment protects." 597 U.S. at 31-32. *But see United States v. Rahimi*, 602 U.S. ___, 2024 WL 3074728 at *11 (June 21, 2024) (cautioning that *Heller* and *Bruen* "did not define the term ['responsible'] and said nothing about the status of citizens who were not 'responsible.'"). Mr. Ward has argued that his "top-secret security clearance . . . evinc[ed] an absence of criminal, reckless, or negligent conduct" and that the "record shows that Mr. Ward has no record of civil or criminal liability, no health issues, and no other obstacles to registering his gun had registration been available to non-residents." But

_____

[12] Where the record does not resolve the question of whether an appellant was qualified to exercise Second Amendment rights, this court typically remands to the trial court for an evidentiary hearing to resolve the issue. *E.g.*, *Plummer*, 983 A.2d at 342; *Magnus*, 11 A.3d at 245.

argument is not evidence, and because the trial court did not evaluate Mr. Ward's Second Amendment claim in its order denying his motion, it did not conduct any fact-finding related to the question of whether Mr. Ward is "part of 'the people' whom the Second Amendment protects," *Bruen*, 597 U.S. at 31-32, or whether he may be "disqualified from the exercise of Second Amendment rights," *Heller*, 554 U.S. at 635. Thus, the first inquiry on remand should be whether Mr. Ward is entitled to the Second Amendment's protection.

## B. Whether the Second Amendment Protects Mr. Ward's Course of Conduct

*Bruen* directs that if a defendant is part of "the people" covered by the Second Amendment, the next consideration is "whether the plain text of the Second Amendment protects [the defendant's] course of conduct," an inquiry aided by historical analysis. 597 U.S. at 32. This is a distinct inquiry from whether the challenged regulation comports with the Second Amendment, despite the possibility that the inquiries will overlap.

*Bruen* clarified that the plain text of the Second Amendment protects the right to carry a firearm outside the home for purposes of self-defense. Nevertheless, aspects of Mr. Ward's conduct may be "relevantly [dis]similar" from the example of an individual walking in a public space, carrying a handgun on their person for self-defense. *Id.* at 29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv.

L. Rev. 741, 773 (1993)).  When Mr. Ward was arrested, he was a Virginia resident who had been driving a motor vehicle in the District of Columbia; in his glovebox, he possessed a fully loaded handgun with a 9 millimeter round in the chamber and a separate magazine also loaded with 9 millimeter ammunition.

We have already referred to federal and local statutes which attempt to regulate the manner in which motorists may transport firearms and ammunition in their vehicles.  These statutes do not create separate criminal offenses, but compliance with them might have provided Mr. Ward with a defense to the UF charge.  As we understand *Bruen*'s methodology, it likely will be the government's burden to establish that such regulations are consistent with the Second Amendment. 597 U.S. at 33-34 (explaining that if "[t]he Second Amendment's plain text . . . presumptively guarantees [the defendant] a right" to engage in his firearm-related conduct, then "the burden falls on [the government] to show that [its regulation] is consistent with this Nation's historical tradition of firearm regulation").  But nonetheless, we will not assume, without parsing the text and history, that the motor vehicle context has no impact on the preceding question of whether Mr. Ward's conduct was "presumptively protect[ed]" by the Second Amendment. *Id.* at 17.

### C.  Whether the 2009 UF Statute is Consistent with this Nation's Historical Tradition of Firearm Regulation

If the trial court determines that Mr. Ward is entitled to the protection of the Second Amendment and that it presumptively protects his conduct, then "the burden falls on [the government] to show that [the UF statute] is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 33-34; *see also United States v. Rahimi*, 602 U.S. ___, 2024 WL 3074728 at *6 (2024) ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'") (quoting *Bruen*, 597 U.S. at 30).  In this case, the regulation in question is the 2009 enactment of the UF statute, D.C. Code § 7-2502.01, as applied to Mr. Ward.  Although *Bruen* "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense [and] does not affect the existing ["shall-issue"] licensing regimes," 597 U.S. at 79 (Kavanaugh, J., concurring), the District of Columbia has separate requirements for licensure and registration.  *Bruen* does not expressly address registration.

Assessing Mr. Ward's challenge to his conviction for violating the registration statute will involve comparisons to past practice to determine "whether 'historical precedent' from before, during, or even after the founding evinces a comparable tradition of regulation."  *Id.* at 27 (quoting *Heller*, 554 U.S. at 631).  This historical analysis may focus on aspects of the UF offense of particular relevance to Mr. Ward,

such as the role of the motor vehicle context or the requirement of District residency, or it potentially may examine the registration regime as a whole.[13]

The District and federal provisions for transporting firearms in a vehicle may bear on this stage of the analysis because complying with them seemingly would have provided a defense to this prosecution. As explained above, these statutes required Mr. Ward to transport the firearm "unloaded," with "neither the firearm nor any ammunition being transported . . . readily accessible" or "directly accessible from the passenger compartment of [his] vehicle." 18 U.S.C. § 926A; D.C. Code § 22-4504.02(b)(1). Mr. Ward indisputably failed to comply with these requirements, meaning that the question of their "consisten[cy] with this Nation's historical tradition" may affect the lawfulness of his conviction. 597 U.S. at 17.

The proceedings on remand may also focus on the issue of residency status, as some courts have done. In two notable pre-*Bruen* cases, the U.S. District Court for the District of Columbia considered the constitutional legitimacy of the residency requirement for registration. *See Palmer v. District of Columbia*, 59 F. Supp. 3d 173, 183 (D.D.C. 2014) (enjoining the District of Columbia "from

_____

[13] If the trial court permits Mr. Ward to withdraw his guilty plea to the UF offense, thus breaching his plea agreement, the CPWL and UA charges may be reinstated. It then may become necessary to consider a Second Amendment challenge to those charges.

completely banning the carrying of handguns in public for self-defense by otherwise qualified non-residents based solely on the fact that they are not residents of the District"; *Smith v. District of Columbia*, 568 F. Supp. 3d 55, 65 (D.D.C. 2021) (stating that "[n]on-residents . . . faced a unique injury [under pre-*Palmer* regulations]—the inability to possess a gun *anywhere* in the District").  On the other hand, Judge Henderson of the D.C. Circuit noted in dissent in *Dearth v. Lynch* that "numerous states prohibited non-residents from obtaining permits to carry pistols and revolvers" in the early 20th century[14] and listed state statutes from that period. 791 F.3d 32, 42 & n.6 (D.C. Cir. 2015) (Henderson, J., dissenting).

Still, it ultimately may be appropriate to more broadly consider the registration regime as a whole.  For instance, the D.C. Circuit, in an iteration of the *Heller* litigation that followed the watershed Supreme Court decision in that case, stated that "basic registration of handguns is deeply enough rooted in our history to support the presumption that a registration requirement is constitutional," *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011), while then-Judge Kavanaugh (who would eventually join the majority opinion in *Bruen*) stated in dissent that "[r]egistration of all lawfully possessed guns—as distinct from licensing

_____

[14] The analysis of *Bruen* apparently would require the trial court to focus on an earlier period when examining historical tradition.  597 U.S. at 11 (noting that the "licensing scheme" it struck down "largely tracks that of the early 1900s").

of gun owners or mandatory record-keeping by gun sellers—has not traditionally been required in the United States and even today remains highly unusual," *id.* at 1270 (Kavanaugh, J., dissenting). Proper resolution of Mr. Ward's arguments requires information (both factual and legal) that is not in the record before this court.

## V. Conclusion

The trial court issued its order without the benefit of *Class* or *Bruen*, two decisions which are essential to reaching an appropriate disposition of Mr. Ward's motion. Accordingly, we vacate that order and remand for further proceedings consistent with this opinion.

*So ordered*.